Daniel C. QUINN, AR, United States Navy, Plaintiff-Appellee,

v.

Harold A. BROWN et al., Defendant-Appellant.

No. 76–1932.

United States Court of Appeals, Ninth Circuit.

Sept. 26, 1977.

---

11. Record on appeal at 218.

Mark H. Gallant, U.S. Dept. of Justice, Civil Division, Washington, D.C., James L. Browning Jr., U.S. Atty., San Francisco, Cal., argued for defendant-appellant.

Melvin K. Dayley, Oakland, Cal., argued for plaintiff-appellee.

Before BROWNING, TUTTLE,* and ANDERSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Quinn brought this action against the Navy in the district court, alleging a breach of his enlistment contract. Quinn sought a writ of habeas corpus ordering his discharge, a declaratory judgment that his enlistment contract was null and void, injunctive relief, mandamus, and money damages. Following a hearing, the district court granted Quinn's motion for summary judgment by order dated January 12, 1976, and on January 21, 1976, the court issued a writ of habeas corpus ordering the Navy to release Quinn from its service. The government timely appealed and jurisdiction vested in this court pursuant to 28 U.S.C. §§ 1291 and 2253.

## FACTS

Quinn first visited his local Navy Recruitment Office in San Mateo, California, during his senior year in high school. He returned several months after graduation and took a battery of pre-enlistment examinations. According to his affidavit filed below, Quinn was primarily interested in receiving training as a machinist mate, but failed to qualify for that program on the basis of his examination scores. Quinn was informed that the only Navy "A" school training program he was eligible for was as a foreign language translator, but that such "A" school training could not be coupled with a duty location guarantee. He was also told that he was eligible for on-the-job training in the Navy "Airman" program, which could be coupled with a guaranteed geographical duty assignment for the first two years of his tour.

According to his affidavit, Quinn did not find the Airman program particularly desirable from the standpoint of providing civilian job skills, since it had only two weeks of schooling and its on-the-job training did not teach specialized skills. However, he did like its geographically-guaranteed duty assignment. Quinn's affidavit also stated that the Navy recruiter told him that:

"if my initial assignment was not according to that guarantee, I would automatically have the right to an honorable discharge. I believed that the automatic right to a discharge was part of the written enlistment contract that was prepared for me to sign by the recruiter. . .
At the time I signed my contract, I believed that I had an automatic right to an honorable discharge if my guarantees were not met, and I would not have signed the contract if I had not believed that I had such a right."

---

* The Honorable Elbert Parr Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

On March 17, 1975, Quinn enlisted in the Navy for a period of four years by signing the enlistment contract. In addition to his enlistment contract, Quinn signed a duty agreement which guaranteed him enrollment in Airman apprenticeship and an initial duty assignment on the West Coast. Quinn specifically elected a West Coast duty port in Hawaii, understood by all parties to be a part of the "West Coast." He stated by affidavit that he would not have signed the enlistment contract had there been no West Coast assignment guarantee.

The following day, March 18, 1975, Quinn entered boot camp in San Diego, California. About three weeks later he approached his Classification Officer to ask if he could change his guaranteed port assignment from Hawaii to Alameda, California, the port closest to his home, because he was "extremely homesick at that time." According to his affidavit, Quinn was informed that if he dropped his Hawaii guarantee, he could not be assured at that point of receiving a specific assignment to Alameda, but that since he could maintain his West Coast guarantee, he might receive an assignment to Alameda. On April 8, 1975, Quinn and the Navy entered into a waiver agreement whereby the Hawaii assignment was waived.[1]

On May 29, 1975, two days prior to the completion of his basic training, Quinn received transfer orders directing him to report to the Naval Air Station in Lemoore, California, for temporary training, and then to depart on July 29, 1975, for an ultimate duty station in Naha, Okinawa, Japan. According to his second affidavit, upon receiving this notification, Quinn asked his company commander whether he could refuse the orders to Okinawa, and was told that he could not. During his training at Lemoore, Quinn approached a Navy Judge Advocate General (JAG) Legal Officer to ask whether the Okinawa assignment violated the West Coast guarantee of his enlistment contract. Quinn was taken to a Petty Officer, who told him that Okinawa was a "West Coast" assignment; the JAG Officer then informed Quinn that his enlistment contract had not been breached.

On July 29th, but prior to departure time, Quinn contacted his congressman to see if the congressman could determine whether his enlistment contract had been breached by the Okinawa assignment. A few hours before Quinn's scheduled departure time, he was notified that his assignment had been delayed and that he was now to report for temporary duty at Treasure Island, California.[2]

On August 4, 1975, after reporting to Treasure Island, Quinn went to discuss his duty assignment with a Navy JAG officer. In addition to asserting that the Navy had breached the contract, Quinn now, apparently for the first time, sought assistance in obtaining a discharge. According to Quinn's affidavit, the JAG officer told him that it was his opinion that Okinawa was not a West Coast assignment, "but that there was little he could do and that a civilian lawyer could help more than a military lawyer." He recommended that Quinn file a "request chit" and go through the chain of command requesting a discharge. Quinn immediately filed a request chit asking for a discharge, and, in his words, "hand-carried the chit up the chain of command, explaining the facts of my guarantee and the orders to Okinawa to each person. Each recommended disapproval."

---

1. Although on its face the waiver agreement did not purport to reserve the West Coast guarantee, the parties stipulated that the April 8, 1975, agreement did not waive the general West Coast duty assignment.

2. The parties disagree as to why this change occurred and who informed Quinn of the change. According to Quinn, a member of the Congressman's staff made an investigation; learned that Okinawa constituted an overseas assignment rather than a West Coast assignment; telephoned Washington, D. C., to lodge a request that Quinn's departure be delayed; and then notified Quinn that his orders to Okinawa had been delayed and that he was to report for temporary duty at Treasure Island, California. According to the Government, it was the Navy who notified Quinn that his orders had been altered and that he was to report for temporary duty at Treasure Island, California.

According to the affidavit of Assistant Military Personnel Officer Robert Herbert, shortly after Quinn's interview with him, Herbert received a telephone call from Personnelman Foozer informing him that the Navy's Congressional Liaison Office in Washington, D. C., had announced that Quinn's orders to Okinawa were being modified to an assignment aboard the carrier Okinawa, homeported in San Diego. Herbert then instructed Foozer to get in touch with Quinn immediately and inform Quinn that his orders were being changed. The next day, August 5, 1975, Foozer reported back to Herbert, informing him that Foozer had told Quinn of the forthcoming change in his orders and also reported to Herbert that Quinn had, the day previous, filed a request for a "Captain's Mast" in order to present his request for a discharge to the Commanding Officer of the Treasure Island facility.

According to the affidavits submitted by the various Naval officers in question, on August 5, 1975, Quinn went to Officer Herbert with his request for a Captain's Mast. Herbert, who had verified the forthcoming change in Quinn's orders, again told Quinn that he was going to be assigned to San Diego carrier duty. Herbert took Quinn to see the Military Personnel Officer, Commander Jerold Stevick, who also told Quinn about the modification in his orders. Finally, in the afternoon of that same day, Quinn had his appointment with Captain John P. Cromwell, who again told Quinn that he was going to be assigned to San Diego, and disapproved the requested discharge. According to Commander Stevick's affidavit, Quinn was told that the modified orders constituted a permanent reassignment and not a temporary one.

Quinn disputes the government's version of what went on in the above-mentioned meetings. According to Quinn's affidavit, he was simply told to deal with his request for discharge at his "next duty station." Further, Quinn stated that he never received positive information that his orders were being modified until August 14, 1975, and even on that date, he did not know whether the new orders were temporary or not, or whether the orders to Okinawa had been cancelled or were "merely being delayed."

On August 8, 1975, just three days after his "Captain's Mast," Quinn filed suit in the federal district court alleging breach of enlistment contract and seeking a writ of habeas corpus ordering his discharge from the Navy. At some time the same day or possibly the next,[3] Quinn's formal orders transferring him to San Diego were teletyped at the Enlisted Personnel Management Center in New Orleans. His orders required him to report for duty aboard the U.S.S. Okinawa on August 22, 1975.

On appeal the government's principal argument is that Quinn failed to exhaust his administrative remedies in that Quinn failed to apply for discharge to the Board for Correction of Naval Records. 10 U.S.C. § 1552. [Compare, Seepe v. Department of the Navy, 518 F.2d 760 (6th Cir. 1975), with Hayes v. Secretary of Defense, 169 U.S. App.D.C. 209, 515 F.2d 668 (1975)]. The government also argues that no material breach occurred, and even if so, rescission was an improper remedy. In light of our holding that the present case is moot, we express no opinion upon the other grounds urged by the government.

We believe that Talbot v. Schlesinger, 527 F.2d 607 (4th Cir. 1975), is persuasively dispositive on the issue of mootness. In that case, Talbot, a skilled illustrator with a college degree in art education, enlisted in

---

3. The parties dispute the effective time of the formal orders. The third line of the teletyped transfer orders indicates that the August 8, 1975, transmittal occurred at 1330 or 1:30 p. m. Greenwich time, which is 7:30 a. m. Pacific time, or prior to the complaint which was filed at 9:00 a. m. on August 8, 1975. On the last line of this teletyped message, the following appears:

IN 00462/09Aug/1513Z/ ACK
This notation seems to indicate that the message was not actually received in and acknowledged until August 9, 1975, after the present complaint was filed. In any event, we do not view either version as dispositive.

the Navy as an "Illustrative Draftsman" on the understanding that he would be assigned to similar work in the Navy. Talbot's enlistment contract contained a disclaimer of any promises or guarantees, but it was Talbot's belief that the disclaimer only applied to his geographic duty assignment. After enlistment, Talbot was given various assignments which were not within the "Illustrative Draftsman" field and, therefore, contrary to Talbot's enlistment understanding. As an example, at the time of trial Talbot was assigned to a museum where his duties consisted of giving guided tours, mowing the lawn, and other general janitorial upkeep work. Claiming that his enlistment contract was breached, Talbot sought release from service.

At oral argument before the Court of Appeals, the parties informed the court that Talbot had been reassigned and was being used as a draftsman in a drafting shop doing work essentially the same as a civilian commercial "illustrator draftsman" would be doing. This information was verified by subsequent facts, including Talbot's written statement which "largely corroborates[d]" counsel's statements. Upon receiving this information, the court held that:

> "[s]ince it appears that in the main, Talbot's alleged contractual understandings have been fulfilled, we think nothing remains to be decided even if it is assumed that we are free to apply common law principles of contract law to a contract of enlistment." 527 F.2d at 608.

In the present case, Quinn's alleged contractual understanding was that he would receive a guaranteed West Coast assignment. It is clear that from the day of enlistment Quinn has never set foot off of the West Coast. Accepting the government's version, Quinn's orders directing him

to Okinawa were changed, or at least in the process of being changed, before Quinn filed his suit. Even under Quinn's version, these orders were changed on August 15, 1975, only seven days after the complaint was filed. Thus, on August 15, 1975, nothing remained to be decided [4] since Quinn's contractual understanding was fulfilled and, unlike *Talbot*, Quinn was never required to undertake any duty (*i. e.*, an overseas assignment) that was contrary to his contractual understanding.

The district court's order issuing a writ of habeas corpus is vacated and this case is remanded with directions to dismiss the case as moot.

---

4. Even if it is assumed, as the court in *Talbot* assumed, that we are free to apply principles of common law contract to a contract of enlistment (cf. *United States v. Larionoff*, 431 U.S. 864, 869, 97 S.Ct. 2150, 2154, 53 L.Ed.2d 48, 54 (1977), the most that Quinn could show is that an anticipatory breach occurred at the time Quinn received his orders directing him to Okinawa. However, it is also very clear that

Quinn can show no compensable damages by reason of the delay in correcting his orders. At all times Quinn never left the West Coast and, accordingly, his alleged contractual understanding was at all times fulfilled. The anticipatory breach, if one occurred, was fully corrected by the Navy before any legal damages ensued.