Colonel Roland F. **CINCIARELLI**, Appellant,

v.

The Honorable Jimmy **CARTER**, President of the United States, et al.

No. 80–1727.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1981.

Decided Aug. 21, 1981.

---

Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 80–0801).

William S. Hemsley, Jr., with whom Frank A. S. Campbell was on reply brief for appellant.

John Oliver Birch, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on brief for appellees.

Before WRIGHT and ROBB, Circuit Judges and PENN *, United States District Court Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This is an action for declaratory and injunctive relief by Colonel Roland F. Cinciarelli, an officer in the United States Marine Corps Reserve. Colonel Cinciarelli alleges that the Commandant of the Marine Corps unlawfully withdraw a signed and executed Standard Written Agreement (SWAG) which provided for Cinciarelli's services on active duty for a five-year period. The District Court concluded that the pertinent statutes permitted the Commandant to withdraw the agreement prior to the first day of the active duty term provided for therein. *Cinciarelli v. Carter*, 490 F.Supp. 302 (D.D.C.1980). Having reached this conclusion as a matter of law the court granted the defendants' motion for summary judgment; the court found it unnecessary to pass on the defendants' secondary contention that the agreement was entered into in violation of Marine Corps Order 1001.52, a standard order which had not been waived. Because our view of the Commandant's

right to withdraw the agreement differs from that of the District Court we remand the case to that court. On remand the court will determine, after an evidentiary hearing if necessary, whether the agreement was made in violation of Order 1001.-52, and if so whether compliance with that order had been waived.

■ The armed services grant Standard Written Agreements to Reserve Officers pursuant to 10 U.S.C. §§ 679–680 (1976).[1]

1. § 679. Active duty agreements

(a) To provide definite terms of active duty (other than for training) for Reserves with their consent, the Secretary concerned may make a standard written agreement with any member of a reserve component under his jurisdiction requiring the member to serve for a period of active duty (other than for training) of not more than five years. When such an agreement expires, a new one may be made. This subsection does not apply in time of war declared by Congress.

(b) An agreement may not be made under subsection (a) unless the specified period of duty is at least 12 months longer than any period of active duty that the member is otherwise required to perform.

(c) Agreements made under subsection (a) shall be uniform so far as practicable, and are subject to such standards and policies as may be prescribed by the Secretary of Defense for the armed forces under his jurisdiction or by the Secretary of the Treasury for the Coast Guard when the Coast Guard is not operating as a service in the Navy.

(d) If an agreement made under subsection (a) expires during a war or during a national emergency declared by Congress or the President after January 1, 1953, the Reserve concerned may be kept on active duty, without his consent, as otherwise prescribed by law.
§ 680. Active duty agreements: release from duty

(a) Each agreement made under section 679(a) of this title shall provide that the member may not be released from active duty without his consent during the period of the agreement—

(1) because of a reduction in the actual personnel strength of the armed force concerned, unless the release is in accordance with the recommendation of a board of officers appointed by an authority designated by the Secretary concerned to determine the members to be released from active duty under regulations prescribed by the Secretary; or

(2) for any other reason, without an opportunity to be heard by a board of officers before the release, unless he is (A) dismissed or discharged under the sentence of a court-martial, (B) released because of an unexplained absence without leave for at least three months, (C) released because he is convicted and sentenced to confinement in a Federal or State penitentiary or correctional institution and the sentence has become final, or (D) released because he has been considered at least twice and has not been recommended for promotion to the next higher grade or because he is considered as having failed of selection for promotion to the next higher grade and has not been recommended for promotion to that grade, under conditions that would require the release or separation of a Reserve Officer who is not serving under such agreement.

(b) A member who is released from active duty without his consent before the end of his agreement made under section 679(a) of this title is entitled to an amount computed by multiplying the number of years and fractions of a year of his unexpired period of service under the agreement by the sum of one month's basic pay, special pay, and allowances to which he is entitled on the day of his release. The amount to which a member is entitled under this subsection is in addition to any pay and allowances to which he is otherwise entitled. For the purposes of this subsection, a fraction of a month of 15 days or more is counted as a whole month, and a fraction of a month of less than 15 days is disregarded. This subsection does not apply to a member if he is—

(1) released for a reason described in subsection (a)(2)(A)–(C);

(2) released because of a physical disability resulting from his intentional misconduct or wilful neglect;

(3) eligible for retired pay or severance pay under another provision of law;

(4) placed on a temporary disability retired list; or

(5) released to accept an appointment, or to be enlisted, in a regular component of an armed force.
10 U.S.C. §§ 679–680 (1976).

2. § 681. Reserves: release from active duty

(a) Except as otherwise provided in this title, the Secretary concerned may at any

These agreements provide for definitive terms of active duty and ensure that the Reservist will not be released involuntarily except according to specified procedures, including a hearing before a board of officers. 10 U.S.C. §§ 679(a), 680(a) (1976). In the absence of a SWAG, a Reservist may be released from active duty at any time, and such a change in status is committed to the sole discretion of the President or the Secretary of the appropriate armed service.[2]

See *Abruzzo v. United States*, 513 F.2d 608, 611 (Ct.Cl.1975); *Woodward v. Moore*, 451 F.2d 346, 347–48 (D.D.C.1978).

In 1978 Colonel Cinciarelli was serving an active duty pursuant to a Standard Written Agreement that covered the period from July 1, 1978 to June 20, 1979. On October 17, 1978 the Marine Corps offered to Cinciarelli a SWAG providing for a five-year period of active duty from June 21, 1979 to June 20, 1984. Cinciarelli accepted this offer by signing the SWAG in the presence of two witnesses and returning it to the Commandant of the Marine Corps on November 20, 1978. In early 1979, a Reserve Officer Selection Board recommended Cinciarelli for promotion to the grade of brigadier general. That recommendation was approved by the President and Colonel Cinciarelli's nomination was confirmed by the Senate in May of 1979. At that time the Marine Corps had authorized billets for 66 active duty general officers. *See* 10 U.S.C. § 5443 (1976).

Shortly after Cinciarelli's promotion was confirmed by the Senate, the Commandant of the Marine Corps determined that Cinciarelli was not required on active duty in the rank of brigadier general, and his SWAG was formally withdrawn on June 11, 1979, ten days prior to the commencement of the term covered by the agreement. The Commandant explained the reason for the withdrawal as follows:

> Your promotion to brigadier general while serving in [active duty] status would create a major difficulty. Specifically, there is no billet presently available to which a Marine brigadier general serving on active duty with the Reserve Establishment can be assigned, nor is there likely to be in the foreseeable future. A contributing factor to this situation is the fact that it is anticipated that the Marine Corps will be required to absorb a reduction of three active duty general officer billets by the end of FY 1980.

(J.A. 25) Cinciarelli was offered two options: he could relinquish his promotion, remain on active duty at the rank of colonel, and possibly earn retirement at the completion of his active duty, or he could be released from active duty upon his promotion to brigadier general and subsequently become eligible for retirement at age 60. (J.A. 37, 42–43) Cinciarelli was then 51 years old, had first been commissioned as an officer in the Marine Corps Reserve in 1953, and had served on active duty for a total of 14 years. Colonel Cinciarelli was unwilling to make the choice put to him by the Commandant and instead filed this lawsuit. On July 1, 1980, after the District Court ruled against him, Cinciarelli was promoted officially to the rank of brigadier general and was released involuntarily from active duty.

Cinciarelli argued in the District Court that his SWAG became a binding contract the moment he executed it. The court, however, held that the Commandant's unilateral withdrawal was lawful and consistent with the statutory scheme. This conclusion was based on the language of 10 U.S.C. § 680(a), in which Congress granted Reserve Officers a right to a hearing before a board of officers prior to involuntary release "during the period of the agreement." The District Court interpreted the quoted phrase to mean that no rights accrued to Cinciarelli under the SWAG until June 21, 1979, the first day of the active duty term. Because the withdrawal occurred ten days before that date, the court found that Cinciarelli was not entitled to either the hear-

---

time release a Reserve under his jurisdiction from active duty.

(b) In a time of war or of national emergency declared by Congress or the President after January 1, 1953, a member of a reserve component may be released from active duty (other than for training) only if—

(1) a board of officers convened at his request by an authority designated by the Secretary concerned recommends the release and the recommendation is approved;

(2) the member does not request that a board be convened; or

(3) his release is otherwise authorized by law.

This subsection does not apply to an armed force during a period of demobilization or reduction in strength of that armed force. 10 U.S.C. § 681 (1976).

ing or the severance pay guaranteed by section 680. Although this interpretation is not facially unreasonable or inconsistent with the statutory language, we believe it gives insufficient weight to Congress' intention in enacting these statutes and hinders the purposes Congress sought to promote.

Sections 679 and 680 were first enacted as sections 235 and 236 of the Armed Forces Reserve Act of 1952, ch. 608, 66 Stat. 481. One express purpose of the Reserve Act was "to enact ... certain new provisions of law which have been shown to be necessary to correct existing defects in policies or practices relating to the Reserve and the individual members thereof." S.Rep.No. 1795, 82nd Cong., 2d Sess. 2 (1952), U.S. Code Cong. & Admin.News 1952, p. 2005. Thus, the Act was characterized frequently by its House managers as "the Reserve Bill of Rights". *See, e. g.,* 97 Cong.Rec. 13159, 13160 (1951); 98 Cong.Rec. 9017 (1952). The cornerstone of this "Reserve Bill of Rights" was the active duty contract provision. *See* 97 Cong.Rec. 13158, 13161 (1951). This provision was necessary, according to both the House and the Senate, "to assure a reservist who enters upon voluntary extended active duty in time of peace that he will not be arbitrarily released from active duty and to guarantee him protection against such release." S.Rep.No.1795, 82 Cong., 2d Sess. 27 (1952); H.R.Rep.No.1066, 82d Cong., 1st Sess. 44 (1951), U.S.Code Cong. & Admin.News 1952, p. 2033. Indeed, Congress attached such importance to the active duty contracts that it made them immediately available to Reservists under the terms of the Act, while the Act's other provisions did not take effect until six months later. *Compare* section 235(f), 66 Stat. 491, *with* section 802, 66 Stat. 505. *See also* 97 Cong.Rec. 13161 (1951).

The House Report described in some detail the problems confronting the Reservist in the early 1950's:

In order to stimulate the voluntary participation of reservists on extended active duty, this bill provides authority for the Secretaries of the departments to offer standard written agreements to reservists covering periods of active duty up to five years. Probably the greatest deterrent to voluntary active duty for extended periods is the uncertainty of the individual as to a period for which he will be retained by the Armed Force. The active-duty contracts will alleviate this condition .... In return for this protection the reservist must obligate himself to remain on active duty for the contract period.

Prior to the outbreak of hostilities in Korea a large portion of the standing Air Force establishment consisted of reservists who were voluntarily serving on extended active duty. The other Armed Forces had similar personnel on active duty. Whenever it became necessary to reduce the strengths of the Armed Forces, reservists were among the first to be released with the resulting disruption of their plans and careers. Such persons were forced, unexpectedly and on short notice, to seek other employment and otherwise to readjust their lives.

H.R.Rep.No.1066, 82d Cong., 1st Sess. 25 (1951).

The Reserve Act addressed these concerns by authorizing the use of active duty agreements, by requiring a hearing prior to involuntary release during the period of the agreement except in enumerated cases, and by providing severance pay based on the unexpired period of service under the agreement for the Reservist who is released involuntarily from active duty. 10 U.S.C. § 680(a), (b) (1976). The value of the active duty contract in allowing Reservists to plan their futures was particularly emphasized in the House discussions of the bill. Representative Brooks gave the following example:

For instance, the Secretary of Air could go down to the University of North Carolina and say: "We need a professor here for a particular type of aeronautical work, and if we could get that man for 2 years we could give him a contract." The University of North Carolina can say: "We can afford to let that man have a leave of absence for 2 years. He may go

into the Air Force if we know we shall have him back at the end of 2 years." So they both sign a written contract and then at the end of 2 years he comes back to his original post of duty. We think that as a result of that contract provision the services of many of these men can be secured . . . .

97 Cong.Rec. 13158 (1951). The same concern with stability and security was expressed by Representative Clemente:

So you see that each reservist who comes to active duty and serves under the contractual provisions of this section of the bill is protected in every way. Upon entrance on active duty, he has a definite term to serve. He can therefore make such plans as are necessary in civilian life for his absence while serving in the Armed Forces. Furthermore, if he must be released before the end of his contractual term, such release can only be effected upon recommendation of a board of officers and, in addition thereto, the bill provides liquidated damages for a release before the end of the contractual term.

97 Cong.Rec. 13161 (1951). Thus, to hold that unilateral withdrawal of an executed agreement at any time before the commencement of the active duty term falls outside these procedural and remedial guarantees would foster the very sort of insecurity and "disruption of . . . plans and careers" that Congress sought to eliminate with the Reserve Act.

The insecurity and disruption of Colonel Cinciarelli's plans and career caused by the abrupt cancellation of his contract, more than six months after it was signed, are demonstrated by his affidavit filed in the District Court. The affidavit states:

If I am moved from active to inactive duty status, I will, in effect, lose my job. I do not now have an outstanding offer for another full-time employment or any employment. Upon removal to inactive duty, I will immediately lose about 90% of my income. I will also immediately lose my health and hospitalization benefits, as will my wife, who is my dependent. My wife has a chronic thyroid condition, which requires regular medical care, and I have received medical benefits for my wife's treatments which I am entitled to as an officer on active duty. Moreover, if placed in inactive status, I would be unable to withdraw retirement benefits until age 60. (I am now 51 years of age.) If I serve on active duty until the expiration of my SWAG, I would be 55, and entitled to immediate payment of retirement benefits. Loss of active duty status would be an immediate and continuing hardship to myself and my wife.

(J.A. 16)

■ Many cases hold that civilian courts may apply traditional contract principles in construing the rights and obligations arising under enlistment contracts and, by analogy, active duty agreements. *See, e. g., In re Grimley,* 137 U.S. 147, 151–52, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890); *Lundgrin v. Claytor,* 619 F.2d 61, 62–63 (10th Cir. 1980); *Peavy v. Warner,* 493 F.2d 748, 750 (5th Cir. 1974); *Shelton v. Brunson,* 465 F.2d 144, 147 (5th Cir. 1972); *Johnson v. Chafee,* 469 F.2d 1216, 1219 (9th Cir. 1972); *Chalfant v. Laird,* 420 F.2d 945, 946 (9th Cir. 1969). *Cf. Quinn v. Brown,* 561 F.2d 795, 799 & n.4 (9th Cir. 1977). It is an elementary principle of contract law that acceptance of an offer creates a binding contract, in the absence of some recognized impediment to contract formation. 1 Williston on Contracts, 51–52, 57–58, 84–85, 212–213 (3d ed. 1957). This principle has been applied in the military setting. For example, in *Johnson v. Chafee,* a serviceman argued that a written agreement to extend his enlistment was void *ab initio* because his signature and oath were sworn before a warrant officer instead of a commissioned officer. The Court of Appeals for the Ninth Circuit, reversing the District Court, held that the agreement was valid and binding:

The agreement in question . . . was valid from the moment Johnson signed his name . . . and swore to his loyalty oath before the warrant officer. Even if Johnson had neglected entirely to take his oath, his signature would have sufficed to bind him.

469 F.2d at 1219 [footnote omitted]. In *Caola v. United States*, 404 F.Supp. 1101 (D.Conn.1975) enlisted men in the United States Navy sued to recover reenlistment bonuses. The court held that the reenlistment agreements were contracts that bound both the Navy and the servicemen when signed:

> At the time of its offer, the Navy asked each plaintiff for a promise to extend the period of enlistment for an additional 24 months. The plaintiffs gave it. Thus, a bilateral contract was made when the agreements to extend enlistment were signed. This view of these agreements is supported by the Navy's refusal to permit the plaintiffs to cancel them. Other cases, indistinguishable from this one, have also found that a bilateral contract was made, between the Navy and each plaintiff, when the "AGREEMENT TO EXTEND ENLISTMENT" was signed.

404 F.Supp. at 1106 [footnotes omitted]. The Supreme Court of the United States also has recognized that reenlistment bonuses are "contractual entitlements". *United States v. Larionoff*, 431 U.S. 864, 880, 97 S.Ct. 2150, 2159, 53 L.Ed.2d 48 (1977).

We think these principles are fully applicable in the present case. It follows therefore that the "period of the agreement" executed by Colonel Cinciarelli commenced when he signed it, and thereby accepted the offer of the Marine Corps. This conclusion carries out the intention of Congress to provide Reservists a measure of security against unjustified and unexpected release from active duty. Accordingly, unless Marine Corps Order 1001.52 made the agreement invalid Colonel Cinciarelli was entitled to the procedural guarantees provided in 10 U.S.C. § 680(a), and he must be accorded the hearing provided by the statute.

Marine Corps Order 1001.52, July 11, 1975, prohibits the grant of SWAGs to officers in the grade of colonel. As we have said, the defendants contend that Colonel Cinciarelli's SWAG cannot be honored because it was entered into contrary to this order, which was not waived. On the motion for summary judgment in the District Court there were conflicting affidavits on the issue of waiver, leading the district judge to find that it was impossible to determine whether or not the order had been waived. In view of our conclusion that the agreement could not be withdrawn, however, the question of waiver must be faced. Accordingly, we remand the case to the District Court for a determination of this issue. On remand the District Court may of course reopen the record and conduct an evidentiary hearing.

*So ordered.*