Christopher K. BROWN, Petitioner,

v.

Vice Admiral Richard M. DUNLEAVY, U.S. Navy, Commander Naval Air Force, U.S. Atlantic Fleet, Naval Air Station, Norfolk, Virginia, Respondents.

Civ. A. No. 89–149–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 28, 1989.

---

Sidney L. Frank, Frank & Stefani, Christine E. Moore–Welch, Troy, Mich., Robert W. Hardy, Knight, Dudley, Pincus, Dezern & Clarke, Norfolk, Va., for petitioner.

Roy C. Hayes, U.S. Atty., Mike Wicks, Peter Caplan, Asst. U.S. Attys., Detroit, Mich., Lieutenant Commander Byard Q. Clemmons, JAGC, USN, Office of the Judge Advocate General, General Litigation Div., Dept. of the Navy, Alexandria, Va., Raymond A. Jackson, Asst. U.S. Atty., Norfolk, Va., for respondents.

## MEMORANDUM OPINION AND ORDER

DOUMAR, District Judge.

Christopher K. Brown, a member of the United States Navy, is before the Court on a petition for a writ of habeas corpus. As a result of material misrepresentations relied on by Christopher Brown in enlisting, he seeks rescission of his enlistment contract with an honorable discharge from active service in the United States Navy. The writ of habeas corpus is GRANTED and the respondent is ORDERED to honorably discharge Christopher K. Brown, SSN 367–96–2459, FORTHWITH from the United States Navy.

### I. BACKGROUND

This action was originally filed on January 20, 1989 in the United States District Court for the Eastern District of Michigan. In addition to seeking an honorable discharge, Christopher Brown sought a temporary restraining order requesting that he be kept on "hold" status and not reas-

signed so he could pursue his legal action and be in a position to aid and consult with his attorneys. On January 31, 1989, the District Court in Michigan denied the motion for a temporary restraining order because the court found that the transfer of Brown to active duty would result in no irreparable harm. The District Court in Michigan also ordered Brown's complaint dismissed without prejudice pending exhaustion of his administrative remedies.

On February 21, 1989, after Brown received orders to fly to Naples, Italy to join the USS THEODORE ROOSEVELT in the Mediterranean, the Michigan District Court reopened the case. The action was reinstated as a petition for a writ of habeas corpus and proper jurisdiction was found to be in the judicial district where Brown was detained and where his custodian was located. *Schlanger v. Seamans*, 401 U.S. 487, 490–92, 91 S.Ct. 995, 998, 28 L.Ed.2d 251 (1971). Accordingly, the case was transferred to the United States District Court for the Eastern District of Virginia, Norfolk Division, and on March 3, 1989, Vice Admiral Richard M. Dunleavy was made the respondent.[1]

A hearing on a temporary restraining order was held on March 2, 1989 which became a request for a preliminary injunction on March 3, 1989 at which time evidence was taken including the testimony of ATC Kevin L. Houle. The Commander, Naval Air Force U.S. Atlantic Fleet, Admiral Richard M. Dunleavy, accepted service of process in his official capacity at that time and the case was continued until March 30, 1989 to be heard on the merits for the writ of habeas corpus. All parties were present in person or by counsel, additional evidence taken and the hearing concluded on the writ and/or permanent injunction.

## II. FINDINGS OF FACT

The Court finds the following findings of fact by clear and convincing evidence:

1. In October, 1987, Brown, an eighteen year old college student, visited the Navy recruiting office in Wayne, Michigan, to discuss his interest in becoming a Navy pilot. Brown met several times with Petty Officer Robert Pepin, a Navy recruiter, who informed him that he could not become a pilot because he did not have 20/20 vision. (Tr. 151.) Petty Officer Pepin also told Brown that enlisted members of the Navy flew in airplanes as air crewmen. (Tr. 38, 151.) Brown made it clear to Petty Officer Pepin, that the only reason he was interested in the Navy was so he could become an air crewman and fly. (Tr. 38–39, 150–52, 155; Plaintiff's Exhibit 3).

2. Brown was told by several recruiters that there was no way he could be guaranteed air crew candidate school. (Tr. 43, 112). Instead, he was told that the "only" way to become a member of an air crew was to go to a technical or "AT" school to become an Avionics Electronic Technician which is an AT rating. (Tr. 152). He was assured that after finishing AT school and with good grades at AT, he could then volunteer for air crew school, and if he did well in AT school, then he would go on to air crew school. (Tr. 40, 56, 152, 155.) If he went on to air crew school he could then obtain an "AW" rating which was an air crewman.

3. Brown was not told that air crew candidate school is a program available to an enlistee if he is given a guarantee for a specific rating which includes that training. (Plaintiff's Exhibits 2, 4). In addition, he was not told that it is possible to enlist in the Navy with a guarantee for the rating AW, a rating that includes air crew candidate school as part of its required training. (Tr. 169, 27–68).

4. Before Brown enlisted, he was given a physical examination and he completed a health questionnaire. On this questionnaire, Brown checked the "yes" box next to the line marked "hay fever." (Defendant's Exhibit 1). Brown was not told by any of the Navy personnel with whom he spoke that hay fever, if not waived, would disqualify him from air crew candidate school. (Tr. 48, 65, 261; Plaintiff's Exhibits 2, 4). He was subsequently repeatedly assured

1. Throughout this opinion, the respondent is also referred to simply as the "Navy."

he could obtain his goal of flying as an air crewman by following the prescribed procedures. In addition to the physical, Brown also took an aptitude test in which his scores were very high across the board and extremely high in the areas required for the AW rating. (Tr. 244–47.)

5. During the recruiting process, Brown met with at least four different naval recruiting personnel: Petty Officer Pepin; Chief Petty Officer Russell Cambone, the Zone Supervisor for nine recruiting stations; Master Chief Petty Officer Reed McKnight, the Chief Recruiter and Command Master in the Navy Recruiting District in Detroit; and Petty Officer David Crawford, a Navy classifier at the Military Enlisted Processing Station in Detroit. In his meetings with these men, Brown made it very clear that his only reason for enlisting was to become a member of an air crew. He continually asked whether there was any way he could be guaranteed air crew training and was told that he could not, but was repeatedly assured that he could become an air crewman if he enlisted in AT school and made good grades. (Tr. 55–56, 62.)

6. The classifier evaluates a recruit's physical and mental qualifications for specific jobs in the Navy. (Tr. 235.) He consults the Navy Recruiting Manual to determine the physical and mental requirements for each job, and he matches them against the recruit's file to determine if the recruit is eligible for a particular job. An important part of his job is to tell a recruit that his career goal is one that he cannot achieve because he does not meet the physical requirements. (Tr. 269, 272–73.)

7. Every Navy recruiter has a copy of the Recruiting Manual. (Tr. 183.) The Recruiting manual gives the requirements for the AW rating. (Tr. 170, 179.) Master Chief McKnight testified in a manner to try to indicate that recruiters are not expected to know or discuss the Navy ratings with potential recruits and that there would not be a guarantee for AW rating but later

admitted that the Navy rating "AW" could be guaranteed with enlistment. He admitted that recruiters had quotas to achieve in recruiting but claimed that if the recruiters failed to meet these quotas that nothing happened. This witness was evasive and skirted the issues. The Court specifically finds his demeanor and manner while testifying to be such as to mandate rejection of much of his testimony, including that portion claiming lack of knowledge of ratings by recruiters, lack of persuasiveness by recruiters, and the meaninglessness of recruitment quotas. (Tr. 171–179) It is so rejected. Petty Officer Pepin, however, testified that he felt it was important to discuss the qualifications for the career goal a recruit was interested in and to let the recruit know if he was eligible for that goal. (Tr. 153) Moreover, McKnight did admit the Navy rating of "AW" could be guaranteed and the Court so finds. Recruiter Pepin stated on many occasions that Christopher Brown would be flying in airplanes and that was the goal of Brown. (Beyer Deposition, p. 10).

8. On October 27, 1987, Brown signed an enlistment contract and entered into the Navy's delayed entry program. His enlistment contract guaranteed that he would be sent to AT training school. (Defendant's Exhibit 1.) This delayed enlistment meant that he would not go on active duty for several months.

9. Christopher Brown enlisted only because the material representations were made to him that: he could be a member of the air crew; that the "only" way was to go to AT school and if he did well he would go to air crew school; that he could not be guaranteed air crew training before entering the service; and that he was physically qualified to be an air crewman.

10. Brown's complaint alleges that Petty Officer Pepin provided him with alcoholic beverages on several occasions during the recruiting process.[2] Before Brown signed his enlistment papers, he had been convicted of driving a vehicle while a pas-

---

**2.** The Court does not decide the truth of these allegations as no evidence was presented on this

subject.

senger had an open container of an alcoholic beverage. In addition, on December 24, 1987, after enlistment but before going on active duty, while returning from a party at which Petty Officer Pepin attended, Brown was arrested for driving under the influence of alcohol ("DUI"). If convicted for DUI, Brown would have been required to attend alcohol awareness classes.

11. A person in the delayed entry program, which Brown was in, who gets a DUI conviction is automatically ineligible to enter active duty unless he requests a waiver. (Tr. at 196–97). At this point, Brown was ineligible for active service without a waiver. On the advice of his recruiters, who wanted him to come into the service and fly, Brown pled guilty to the lesser charge of driving while impaired and was allowed to enter active duty on February 2, 1988, so that he could become an air crewman. (Tr. 75–78; Defendant's Exhibit 1).

12. However, the conviction of driving while impaired took the designation D.U.I. (driving under the influence) for Navy records and unbeknown to Brown was made a part of his permanent record (even the short form computer printout), which record indicated he was not qualified for overseas service. (Attachment IV, Respondent's Opposition to Petitioner's Motion for Reconsideration filed Feb. 17, 1989 in Michigan and Feb. 27, 1989 in Norfolk). Again, unknown to Brown, this designation would prevent him from becoming a member of an air crew. This was supposedly waived but his service record did not so indicate.

13. Brown completed boot camp, where he was made a squad leader, (Plaintiff's Exhibit 3), and then he went to AT school in Millington, Tennessee. In November, 1988, Brown completed his AT training and graduated at or near the top of his class. (Tr. 350).

14. In June, 1988, while a student at AT school, Brown attempted to volunteer for air crew. He was given a flight physical and he was informed that he was ineligible for air crew and for overseas assignment because of the driving under the influence

designation on his record. (Tr. 81–82). Upon learning this, Brown requested a discharge from the Navy and he enlisted the services of a lawyer because he could not become a member of an air crew. (Tr. 83). His family also sought the aid of Senator Riegle of Michigan in order that he might help Brown in obtaining a discharge because he could not become a member of an air crew. Senator Riegle wrote a letter to the Navy's Chief of Legislative Affairs on July 5, 1988, asking him to investigate the recruiting violations and to assist Brown in his discharge request.

15. Senator Riegle was assured that the reason for denial of air crew schooling was due to a "physical disqualification for that program," i.e., hay fever, as attested to by Commander R.R. Walker, Assistant Director of the Enlisted Programs Division of the Navy Recruiting Command (P–4 Ltr. dated Feb. 9, 1989), and the documentation would indicate that the DUI designation had nothing to do with his disqualification. This DUI was supposedly waived when he entered the service.

16. While at AT school, Brown was involved in a barracks drinking incident. He was given extra military instruction as a punishment. Ostensibly, the record of this incident did not become part of Brown's permanent service record (Tr. 303, 353) and indeed under Navy regulations could not have been such. After this, Chief Petty Officer Steffens, the supervisor of Brown at AT school, wrote a brief memorandum stating that Brown had proven himself and was a "very square Navy sailor," and he recommended that Brown be "given every consideration for air crew waiver." (Plaintiff's Exhibit 6).

17. Brown submitted an air crew waiver request chit on September 23, 1988. (Plaintiff's Exhibit 5). His waiver request was recommended for approval by two enlisted persons and by a lieutenant. On September 28, 1988, a fourth person, Lieutenant Commander J.E. Pierson, the Training Officer in charge of the Avionics Technician Course Class A–1 at Millington, Tennessee, then received the waiver request. He first checked the "yes" box on the chit indicat-

ing that he recommended approval of Brown's waiver. Later he changed his response and checked the "no" box. In addition, he wrote in the margin: " *We need to get hot on this. I have already discussed it with NMPC [Naval Military Personnel Command]. * * NPQ [not physically qualified]." (Plaintiff's Exhibit 2.)

18. On September 28, 1988, Commander Pierson also received a medical examination report regarding Brown. The report was marked "NPQ: Hay Fever," and "Waiver Recommended." (Plaintiff's Exhibit 10.) Commander Pierson sent this medical form back because it did not meet with his approval. The next day he received a virtually identically marked form, except it did not recommend a waiver. (Plaintiff's Exhibit 9). Commander Pierson testified that he sent the form back so that everything would be covered and Brown would be given the benefit of the doubt by having another and more appropriate military person sign the form. He specifically claims that this was done for Brown's benefit. (Tr. 336).

19. The Court, however, rejects Commander Pierson's testimony and finds that the reason the medical form was sent back was so that he would receive a form that did not recommend a waiver, to the clear detriment of Brown. The manner and form of the testimony made it clear to this trier of fact that Commander Pierson was initially predisposed to grant the waiver. At the same time as he received the medical form recommending the waiver, someone from the Naval Military Personnel Command contacted him and caused Pierson to change his mind. He then sent the medical form back to the medics to get a new form for the express purpose of obtaining a rejection of the waiver and the Court so finds and further finds that this was done at the instance of the Naval Military Personnel Command.

20. In addition, Commander Pierson testified that Brown's past alcohol incidents also influenced his decision to not grant the waiver. (Tr. 295–300). The Court disregards this testimony because of the demeanor and manner of Pierson on the stand and further because it is directly contradicted by four Navy documents, one of which was prepared by Commander Pierson himself. (Plaintiff's Exhibits 2, 4, 5, 8). All of these documents state that Brown was not physically qualified for air crew because of his hay fever and not because of alcohol.[3]

21. When Brown's action for a temporary restraining order was before the United States District Court for the Eastern District of Michigan, the Navy introduced the affidavit of ATC Kevin L. Houle dated January 23, 1989. One issue was Brown's availability and presence to consult with his attorneys. ATC Houle stated in his affidavit filed in Michigan that Brown was considered "ineligible for an overseas assignment," and he stated that Brown would be under orders in approximately three weeks. The affidavit would indicate that Brown would not be out of the United States. At the time the affidavit was executed, the orders were already designated but not issued and known by the affiant requiring Brown to fly to Naples, Italy to join a ship which had a home port in Norfolk, Virginia, and which was on indefinite assignment in the Mediterranean. (Testimony, March 3, 1989). The affidavit failed to clarify that ineligible for overseas assignment only

---

3. In the respondent's "Opposition to Petitioner's Motion for Reconsideration," filed on February 17, 1989, the Navy attached two lengthy reports. The first attachment was the complete report on Brown prepared by the NMPC. The second attachment contained the complete report of the Navy Recruiting Command ("NRC"). The NRC report contained a copy of Senator Riegle's initial letter requesting an inquiry into Brown's case. The letter requested that the Navy investigate both the "serious questions about recruitment violations," and "the validity of this enlistment contract." The reports of the NMPC and the NRC are both very careful to exonerate the recruiters involved of any alcohol infractions during the recruiting process. In fact, the reports appear to be more concerned with finding that no recruiter misconduct took place than with determining whether Brown was subjected to any misrepresentations during the recruiting process. In its official reply to Senator Riegle, the NRC stated that "the allegations concerning recruiter misconduct could not be substantiated." (Plaintiff's Exhibit 4). The letter to Senator Riegle makes no mention of alcohol as the reason for denying Brown's air crew waiver.

meant that Brown could not be assigned to a ship with a home port outside of the United States.

20. On February 2, 1989, two days after the court in Michigan denied the temporary restraining order and dismissed Brown's complaint, the previously designated orders were issued to Brown to travel to Italy and report for duty aboard the USS THEODORE ROOSEVELT, then on a tour of duty in the Mediterranean, and Houle testified that he knew this prior to the time he made the affidavit. This Court, after hearing Houle testify on March 3, 1989, concluded and finds as a fact that the material concerning no overseas duty was designedly placed in the affidavit presented to the Michigan District Court.

## III. CONCLUSIONS OF LAW

Under 28 U.S.C. section 2241, this Court has the power to grant a writ of habeas corpus to any "prisoner" in custody under color or authority of the United States. It is well settled that the term prisoner applies to servicemen who are "unlawfully retained in the armed forces." *Parisi v. Davidson,* 405 U.S. 34, 39, 92 S.Ct. 815, 818, 31 L.Ed.2d 17, 26 (1972); *see also Schlanger v. Seamans,* 401 U.S. 487, 489, 91 S.Ct. 995, 997, 28 L.Ed.2d 251, 253–54 (1971). Two separate grounds support Christopher Brown's petition for a writ of habeas corpus. First, he asserts that he is entitled to rescission of his enlistment contract because material misrepresentations made by Navy personnel induced him to enlist. Second, he claims he is entitled to habeas corpus relief because the Navy has failed to comply with its own regulations. The Court agrees with both of the petitioner's assertions.

■ The Court acknowledges that judicial authority over military affairs is generally limited out of deference to the special competence and power of the military in regulating its own affairs. *See, e.g., Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). This reluctance to interfere in military affairs has been fol-

lowed in the many prior Navy cases before this Court. However, the rule is not absolute. The degree of deference the Court must afford a decision of the military varies according to the nature of the military action. *Peavy v. Warner,* 493 F.2d 748 (5th Cir.1974). The recruiting activities of several members of the United States Navy are at issue in this case. Such activities, by their very nature, involve a crucial intersection of the military and the general public that cannot be left to the sole discretion of the military. This case also involves a dispute over the formation and interpretation of a contract, an area that clearly falls within the expertise of the judiciary. *See Santos v. Franklin,* 493 F.Supp. 847 (E.D. Pa.1980). In addition, the Fourth Circuit has held that the traditional reluctance of courts to interfere in military decisions does not apply when the military has acted in violation of its own regulations. *Williams v. Wilson,* 762 F.2d 357 (4th Cir. 1985). In view of the existence of the habeas corpus remedy for military personnel and the important issues involved, judicial action is warranted in this case.

### A.

■ Claims by members of the military that enlistment contracts have been breached or are invalid are decided under traditional theories of contract of law. *Woodrick v. Hungerford,* 800 F.2d 1413, 1416 (5th Cir.1986), *cert. denied,* 481 U.S. 1036, 107 S.Ct. 1972, 95 L.Ed.2d 812 (1987); *Cinciarelli v. Carter,* 662 F.2d 73, 78 (D.C.Cir. 1981); *Pence v. Brown,* 627 F.2d 872, 874 (8th Cir.1980). General principles of contract law are applied, rather than the law of any one state, because of the unique relation between the military and those in the armed services, and the need for a consistent interpretation of enlistment contracts. *United States v. Standard Oil Co. of California,* 332 U.S. 301, 305–06, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067, 2070 (1947). One court has noted that "[t]he cases construing such contracts constitute an evolving body of specialized federal common law...." *McCracken v. United States,* 502 F.Supp. 561, 569 n. 62 (D.Conn.1980).

■ Under general contract principles, rescission of an enlistment contract is the proper remedy when military recruiters make material misrepresentations, even if innocent or non-negligent, that induce a prospective recruit to enlist. *Pence v. Brown*, 627 F.2d at 874; *Helton v. United States*, 532 F.Supp. 813, 828 (S.D.Ga.1981); *Withum v. O'Connor*, 506 F.Supp. 1374, 1378 (D.P.R.1981); *see also Woodrick v. Hungerford*, 800 F.2d at 1416; Restatement (Second) of Contracts § 164. For example, in *Pence*, Air Force recruiters misrepresented to the petitioner, who was then in medical school, that he would enter active duty as a major. Even though the petitioner's enlistment contract was silent as to rank and promotion, the court held that this material misrepresentation induced the petitioner to enlist and was enough to warrant rescission of his enlistment contract. 627 F.2d at 873–75.

Brown's contract claim is even more compelling. He made it clear from the moment he first contacted the Navy recruiters that the only reason he sought to enlist was to become a member of an air crew. In addition, he was not satisfied with the advice of just one recruiter, but instead, he made inquiry of at least three other Navy recruiters. While conscious of Brown's goal, the recruiters and classifier who advised him made several misrepresentations that induced him to enlist. First, he was told that the "only" way to become an air crewman was to go to AT school, do well, and then volunteer for air crew. Second, he was told that he could not be guaranteed air crew training even though the Navy has a rating, the AW, that would have guaranteed him such training before entering the service. Finally, even though he openly disclosed his hay fever prior to enlisting, he was told that he was physically qualified and that he could become an air crewman. Because of Brown's singular desire to fly, it is clear that had he learned the truth with regard to any of these misrepresentations he would not have enlisted in the Navy. Further, these misrepresentations were clearly material as they "went to the heart of [his] stated reasons for investigating and joining the Navy." *Withum*, 506 F.Supp. at 1378.

The fact that Brown's enlistment contract is silent as to these misrepresentations is not dispositive of this case. The petitioner in *Pence*, an older and more educated man than Brown, also signed an enlistment contract that did not contain the misrepresentations made by the recruiters. This fact did not affect his right to rescission. 627 F.2d at 873. In addition, the Navy's "guarantee" that Brown would attend AT school only tended to exaggerate the misrepresentations. *See Novak v. Rumsfeld*, 423 F.Supp. 971, 972 (N.D.Cal. 1976). Brown was told that AT school was the only and the best way to go to become an air crewman. Obviously, his enlistment contract, which contained the AT school guarantee, appeared to be exactly what he wanted based upon the knowledge he had as a result of the recruiter misrepresentations.

All the elements necessary under the general contract law governing rescission of enlistment contracts are presented in this case. These material misrepresentations were made to Brown that induced him to enlist in the Navy as an AT thinking it was the only and best way he could become an air crewman.

### B.

■ The writ of habeas corpus is also the proper remedy for military personnel who are retained in the military in violation of applicable statutes or the military's own regulations. *Peavy v. Warner*, 493 F.2d at 749–50; *Johnson v. Chafee*, 469 F.2d 1216, 1218–19 (9th Cir.1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2146, 36 L.Ed.2d 686 (1973); *see also United States ex rel. Lehman v. Laird*, 430 F.2d 96 (4th Cir.1970). The Secretary of Defense has promulgated the following regulation governing recruiter misrepresentations:

3. *Defective enlistment agreements.* a. *Basis.* A defective enlistment agreement exists in the following circumstances:

(1) As a result of a material misrepresentation by recruiting personnel, upon

which the member reasonably relied, the member was induced to enlist with a commitment for which the member was not qualified.

32 C.F.R. § 41 App. A, Part 1(E)(3)(a) (1988). The regulations also stated that an honorary discharge is the appropriate remedy for violations of this section as long as the recruit brings the defect to the attention of the appropriate authorities within thirty days of discovery and the recruit requests separation instead of taking any other corrective action. 32 C.F.R. § 41 App. A, Part 1(E)(3)(b)–(c).

■ The conduct of the Navy recruiters who counseled Brown was clearly in violation of this regulation. As already discussed *supra,* the recruiters made three material misrepresentations upon which Brown relied when he enlisted. The fact that he contracted for the AT rating, for which he is still qualified, does not negate the application of this regulation. Because of the recruiters' misrepresentations, Brown enlisted in the AT program because he believed it was the only approach he could take to become an air crewman. He enlisted to become an air crewman and everyone connected with the matter knew this and encouraged this. Navy recruiters made this inducement even though his disclosure of his hay fever plainly indicated that he was not physically qualified for air crew. Further, in June, 1988, when Brown first learned that he was not qualified for air crew, he immediately sought separation from the Navy and contacted an attorney and sought Senator Riegle's aid in procuring a discharge.

In *United States ex rel. Lehman v. Laird,* 430 F.2d 96, the Fourth Circuit granted a writ of habeas corpus in an analogous situation. The petitioner in *Lehman* requested discharge from the Navy under 50 U.S.C.App. § 456(j) on the basis of his religious objections to war. The Navy concluded that the petitioner's objections to war were not religiously based and denied his request for a discharge. The court found that the Navy was incorrect in its conclusion that the petitioner's beliefs were not religious. Because the Navy

failed to follow the requirements of section 456(j) and grant conscientious objector status to the petitioner, the court granted the writ of habeas corpus. 430 F.2d at 100; *see also United States ex rel. Tobias v. Laird,* 413 F.2d 936 (4th Cir.1969).

Similarly, the Navy has failed to follow 32 C.F.R. § 41 App. A, Part 1(E)(3) in its dealings with Brown. This regulation demonstrates the concern of the Secretary of Defense for servicemen like Christopher Brown, who enlist as a result of material misrepresentations. Brown's case is especially troubling as he was subjected to three different misrepresentations, and these misrepresentations were conveyed to him by at least four members of the Navy involved in the recruiting process. These representations were proven by clear and convincing evidence to be material misrepresentations. Moreover, it was proven by clear and convincing evidence that they were relied on by Christopher Brown to induce him to enlist to become an air crewman. Because the Navy has violated its regulations in this case, Christopher Brown is entitled to habeas corpus relief.

### C.

The respondent has advanced several arguments against granting the writ of habeas corpus in this case. First, in virtually every brief filed in this case the Navy has argued that this Court should not review Christopher Brown's petition because he had not exhausted his administrative remedies by appealing to the Board for Correction of Naval Records ("BCNR"). *See Williams,* 762 F.2d 357. Brown filed an application with the BCNR on February 16, 1989. The BCNR assembled a complete record of his case, including a comment from the NMPC recommending denial of his petition.

In a motion to dismiss filed on March 22, 1989, the respondent submitted an affidavit from W. Dean Pfeiffer, the Executive Director of the BCNR. Mr. Pfeiffer stated that the BCNR would "expedite" processing Brown's application and that review of his case would be finalized within thirty days of the receipt of his rebuttal.

Brown's counsel filed a rebuttal on April 10, 1989. Based upon these assurances, this Court waited for more than three months past the date when the BCNR stated that Brown's case would be decided. On August 21, 1989, this Court ordered the respondent to advise the Court within ten days of the status of Brown's application to the BCNR. Nine days later, the BCNR denied Brown's application. Since the BCNR has finally acted, the respondent's arguments are without merit.

▮ Even if the BCNR had not rendered a final decision, this Court would have reached the merits of Christopher Brown's case. The consistent pattern of conduct demonstrated by the Navy in this case clearly provided the futility of Brown's pursuit of intraservice administrative remedies. *Woodrick*, 800 F.2d at 1417; *see also Tobias*, 413 F.2d at 938–39. The Navy's conduct throughout this case has been reprehensible. The recruiter's misrepresentations were only the beginning. The evidence is clear and the Court specifically finds as a fact that Commander Pierson sent back to the hospital the medical form that recommended a hay fever waiver in order to obtain a new form that did not recommend a waiver after a conversation with the Navy Military Personnel Command. In addition, the Navy failed to explain to the United States District Court in Michigan that the designation "ineligible for overseas assignment," only meant that Brown could not be assigned to a ship permanently stationed overseas. Judge George E. Woods of the United States District Court in Michigan independently determined the futility of pursuing administrative remedies. *Brown v. United States Dept. of the Navy*, 89–CV–70213–DT (Proceedings of February 21, 1989). The Navy also completed two internal investigations, one by the NMPC and the other by the NRC, both of which rejected Brown's claims. Finally, the BCNR took three and one half months longer to decide Brown's case than they promised this Court. The Court notes the BCNR finally reached its decision nine days after a ten-day order by this Court to update the status of Christopher Brown's case. The futility of naval relief is exemplified by the actions of the Navy in this case. The Court finds as a fact by clear and convincing evidence that it would be futile to pursue administrative remedies.

### D.

The respondent has also repeatedly argued that evidence of the misrepresentations made to Christopher Brown may not be admitted because of the parol evidence rule. In support of this argument, the respondent cites two clauses in the enlistment contract signed by Brown.

8c. The agreements in this section and attached annex(es) are all the promises made to me by the Government. ANYTHING ELSE ANYONE HAS PROMISED ME IS NOT VALID AND WILL NOT BE HONORED.

13A. I FULLY UNDERSTAND THAT ONLY THOSE AGREEMENTS IN SECTION B OF THIS DOCUMENT OR RECORDED ON THE ATTACHED ANNEX(ES) WILL BE HONORED. ANY OTHER PROMISES OR GUARANTEES MADE TO ME BY ANYONE ARE WRITTEN BELOW.

Defendant's Exhibit 1.

▮ The parol evidence rule does not bar admission of the material misrepresentations made to Brown. Under the general principles of contract law that govern this case there is a well established exception allowing extrinsic evidence to show inducement to contract by fraud or misrepresentation, even if the contract has a merger clause. *See, e.g., Starling v. Valmac Indus., Inc.*, 589 F.2d 382, 386 (8th Cir.1979); *Centronics Financial Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir.1978); *Shevel's Inc. v. Southeastern Assoc., Inc.*, 228 Va. 175, 183, 320 S.E.2d 339, 343–44 (1984); *Potomac Leasing Co. v. Thrasher*, 181 Ga.App. 883, 354 S.E.2d 210 (1987); *see also* Restatement (Second) Contracts § 214; Corbin on Contracts § 578 (1960). Moreover, under the military's own regulations governing administrative board procedures "[t]he rules of evidence for courts-martial and other

judicial proceedings are not applicable...." 32 C.F.R. § 41 App. A, Part 3(B)(3)(e). If the Court adopted the Navy's position and excluded evidence of the misrepresentations, it would render the 32 C.F.R. § 41 App. A, Part 1(E)(3), discussed *supra*, completely unenforceable. Anyone seeking relief under these regulations by necessity must be allowed to present evidence of the material misrepresentation that induced his enlistment.

■ In addition, the two clauses of the enlistment contract cited by the Navy do not bar testimony regarding the three material misrepresentations made to Brown because none of these misrepresentations can be construed as an additional "promise" or "guarantee." Counsel for the Navy admitted that the enlistment contract does not state that it is an integrated contract that precludes any extrinsic evidence regarding prior oral negotiations. (T. 93). Brown did not bring a petition for habeas corpus to dispute the terms of his enlistment contract or any promises and guarantees made therein. His petition is based on material misrepresentations made during the enlistment process. Naturally, these misrepresentations are not contained in the enlistment contract. The terms of the contract of enlistment are not antagonistic to the misrepresentations.

### E.

■ Finally, the Navy argues that any misrepresentations made to Brown were made by Navy personnel who lacked actual authority to make such misrepresentations. The Navy also argues that it cannot be estopped from denying the misrepresentations because anyone who contracts with the government is charged with knowledge of the government's rules and regulations. *See, e.g., Jackson v. United States,* 573 F.2d 1189, 216 Ct.Cl. 25 (1978). The Navy's arguments are misplaced, however, for these doctrines do not apply with the same force in the context of military enlistment contracts. An eighteen year old young man who signs an enlistment contract is in a far different position than the ordinary government contractor.

This case is quite different from a suit against the government for misrepresentations in contracting in which the complaint seeks money damages or specific performance. The proposition that the government cannot be held responsible for the misstatements of its agents does not extend to representations which induce a contract when the remedy sought is rescission.

*Pence,* 627 F.2d at 874; *see also Helton,* 532 F.Supp. at 828; *Withum,* 506 F.Supp. at 1378; *Santos,* 493 F.Supp. at 855–56. Because recruiter misrepresentations led him to enlist, Brown only seeks the remedy of rescission. He does not seek money damages as the plaintiff in the *Jackson* case did, and he also does not seek to specifically enforce any of the misrepresentations that were made to him.

The integrity of the recruiting process in today's all volunteer peacetime Navy compels rescission of Brown's enlistment contract.

In recruiting, the Navy must accurately inform prospective enlistees of both the available educational-training opportunities and the stringent qualifying criteria for these attractive programs. Without this candid appraisal of the benefits as well as the burdens, the Navy cannot expect to foster credibility among prospective recruits. Without candid disclosure and a commitment to follow through on recruitment promises, a volunteer Navy cannot function.

*Novak,* 423 F.Supp. at 972. In addition, Brown made inquiry beyond what would reasonably be expected of a prospective enlistee. He not only questioned his recruiter, but he also sought out his recruiter's supervisor and then, finally, the supervisor for the entire state of Michigan. He asked all of these people, as well as the classifier, if there was any way he could be guaranteed air crew training. He was consistently told that he could not. Even after hearing all his questions, no one told Brown about the AW rating and that he in fact could be guaranteed air crew training but affirmatively indicated that "AT" school was the only way to become an air

crewman. Christopher Brown also clearly and openly disclosed his hay fever, yet no one told him that it made him not physically qualified for air crew but affirmatively indicated that if he had good grades in AT school he would be an air crewman regardless.

When a young person enters a Navy recruiting office he is met by Navy personnel whose authority is clearly manifested by their uniforms and accompanying stripes, ribbons, medals, and gold braids. It would be ludicrous for this Court to hold that the Navy is not responsible for the misrepresentations of its uniformed recruiting agents. Such a holding would require prospective enlistees to retain professional counsel to make an investigation of the Navy's ratings and programs in order to deal with recruiters. The Court agrees with the court in *Santos v. Franklin* that in situations such as these "it would be unconscionable to permit the Navy to disavow the act of its agent on the ground that the agent erred." 493 F.Supp. at 855.

The existence of the habeas corpus action to rescind an enlistment contract induced by recruiter misrepresentations mandates that the actual authority and government estoppel doctrines not apply in such situations. If the Navy could deny the authority of its recruiters or claim that it could be estopped, it would be impossible to successfully rescind an enlistment contract on the basis of recruiter misrepresentations. The Navy's own regulations, 32 C.F.R. § 41, App. A, Part 1(E)(3), oppose the Navy's argument because they allow for rescission when a recruit is induced to enlist by recruiter misrepresentations. These regulations, in order to be enforceable, obviously require that the actual authority and estoppel doctrines not apply when an enlistee seeks a discharge on these grounds.

## IV. CONCLUSION

The Court finds by clear and convincing evidence that during the recruiting process members of the Navy made three material misrepresentations upon which Christopher Brown relied that induced him to enlist.

Believing because of these misrepresentations that it was the only way he could achieve his enlistment goal of becoming an air crewman, Brown signed an enlistment contract. The outrageous conduct by the Navy, both when the misrepresentations were made to Brown and their actions subsequent thereto, involve a much greater degree of misconduct than in any similar case.

Because the Navy's conduct violated both traditional theories of contract law and the Navy's own regulations, Christopher K. Brown's petition for a writ of habeas corpus is GRANTED and the respondent is ORDERED to discharge him honorably from service in the United States Navy FORTHWITH.

IT IS SO ORDERED.