UNITED STATES of America,
Plaintiff–Appellee,

v.

Gilberto MELENDEZ, Defendant–
Appellant.

No. 90–5682

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1991.

Rehearing Denied Oct. 30, 1991.

Diane C. Van Helden, Barry Bishop, Joanne Summerhays, Austin, Tex., for defendant-appellant.

Sharon S. Pierce, Asst. U.S. Atty., Austin, Tex., for plaintiff-appellee.

Before JOLLY, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The defendant in the civil case, Gilberto Melendez, attacks a directed verdict awarding damages to the government because of the Melendez's failure to comply with the service obligation incident to a government-sponsored scholarship program. Concluding that a reasonable jury could not have decided in favor of Melendez, we affirm.

I.

Between 1980 and 1983, while Melendez was in medical school, he applied for and

received three one-year scholarship awards totaling $27,800 from the National Health Service Corps (NHSC) scholarship program. *See* 42 U.S.C. §§ 254*l*–254q. The program, administered by the Secretary of Health, Education, and Welfare, was established to address the maldistribution of healthcare workers in the United States. § 254*l*(a).

Under the program, scholarship recipients agree to provide full-time health services in areas that have been designated by the Secretary as health manpower shortage areas (HMSA's). §§ 254e, 254*l*(f)(1)(B)(iv). The service commitment may be met either as a civilian employee in the Corps of the Public Health service or as a private employee in clinical practice in an HMSA. §§ 254m, 254n. The period of obligated service commences after completion of the recipient's healthcare education and continues for two, three, or four years, depending upon the number of one-year scholarships awarded to the recipient. § 254*l* (f)(1)(B)(iv). *See generally Buongiorno v. Sullivan,* 912 F.2d 504, 505–06 (D.C.Cir. 1990).

Melendez agreed to fulfill his three-year NHSC commitment as the full-time private employee of the Laredo–Webb County Health Department, Laredo, Texas (the Laredo clinic). Accordingly, Melendez executed a private practice agreement in accordance with § 254n. The agreement provided, *inter alia,* that if the Laredo clinic terminated Melendez's employment prior to the expiration of the NHSC contract, the NHSC would reassign him to another HMSA for the remaining period of his service obligation.

Melendez began serving his three-year commitment on July 16, 1984. However, in early March 1985 the director of the Laredo clinic notified Doug Mahy of the NHSC that the clinic did not wish to renew Melendez's employment contract, which was to expire on April 1, 1985. The clinic informed Melendez on March 8, 1985, of its

desire to terminate the contract. On March 11, 1985, Melendez called Mahy and explained that his contract would probably not be renewed and requested that arrangements be made for a reassignment.

Over the course of the next four months, numerous communications occurred between Melendez,[1] Mahy, and the Laredo clinic. Many of the specific facts pertaining to these communications are disputed.[2] The basic summary of this evidence is as follows: Melendez testified that he persistently urged Mahy to secure him a new assignment, and he relied upon Mahy's representations that neither his salary nor his service commitment would be interrupted and that a new position could be secured within one month. Mahy denied making these representations and claimed that he reasonably believed that Melendez and the Laredo clinic would resolve their differences and that Melendez would fulfill his three-year commitment at the Laredo clinic. During this time the Laredo clinic granted two extensions on the contract termination deadline, purportedly to provide Melendez with an opportunity to secure a new position. The final expiration date was set for July 31, 1985.

Until the beginning of July 1985, Mahy continued in this belief that Melendez would be able to continue at the Laredo clinic, at which time he realized that Melendez's termination was imminent. Accordingly, Mahy informed Melendez of a possible opening in El Paso. Again, the facts relating to the El Paso position are both confusing and disputed. The upshot of the evidence, however, is that Mahy arranged for Melendez to secure a position in a clinic in El Paso. By July 31, 1985, the day Melendez's contract with the Laredo clinic expired, a reassignment to El Paso was virtually set, and Mahy sent Melendez a new private practice agreement and travel forms authorizing payment for moving expenses. Mahy warned that the reassignment was not official, however, until final approval was obtained from the Washing-

---

**1.** At the end of May, Melendez retained an attorney to assist him in dealing with the NHSC.

**2.** Additionally, the evidence is confusing, and in several instances, the parties' accounts of dates in the factual presentation in their briefs are inconsistent with the trial evidence.

ton, D.C., office. Melendez testified that prior to this time, Mahy had led him to believe that the reassignment was already approved.[3]

On August 22, 1985, Mahy informed Melendez that the El Paso job would not be approved. Over the course of the next week, Melendez contacted numerous NHSC officials about a reassignment as well as credit toward his service commitment and payment for his time out of work. Those officials told him that they did not know when or where he would be reassigned and denied that he would receive payment or credit for his time out of work.

On August 29, 1985, Melendez asked to be released from his obligations under the NHSC contract. In the request, Melendez claimed that he had been unemployed since July 31, 1985.[4] He also claimed that he desired to resume his specialty training after completing his service obligation and pointed out that if no credit were allowed for the time he spent without an assignment, it would be impossible for him to enter a residency training program at the completion of his service commitment, inasmuch as most residency training programs begin on September 1. Thus, he argued, he would lose a year in completing his training. Finally, he argued that the uncertainties created by the numerous broken promises and misrepresentations of the NHSC placed too great a burden on his professional career.

On or about September 3, the NHSC approved Melendez for an immediate transfer to a position in Brawley, California, and Melendez was informed of this fact on or shortly after this date.[5] By letter dated September 19, 1985, the NHSC denied Melendez's request to be released from his

obligations under the contract. Melendez never reported to California, and the NHSC later declared him in default.

## II.

In October 1988, the United States filed a complaint against Melendez for $118,-509.61. The sum was calculated in accordance with 42 U.S.C. § 254o (b)(1)(A) and represents three times the scholarship principal plus interest, prorated to account for the time Melendez served on his obligation. Melendez answered that he had not breached the contract and counterclaimed that any breach was excused because the government's own breach prevented him from completing his obligation.

On September 10–12, 1990, the matter was tried to a jury; however, at the close of Melendez's case, the court granted the government's motion for a directed verdict on its claim against Melendez and on Melendez's counterclaim. On November 2, 1990, the court entered a judgment against Melendez in the amount of $139,294.45, an amount reflecting that requested in the complaint plus interest accrued between the time of the filing of the complaint and the time of the trial in September 1990.

## III.

We will affirm a directed verdict only when the facts and inferences point so strongly and overwhelmingly in favor of one party that we believe that reasonable jurors could not arrive at a contrary verdict. *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc); *Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1371 (5th Cir.1982) (en banc). Melendez argues that a directed verdict was improper in light of the evidence that (1) the Secretary

---

**3.** Melendez testified that Mahy told him at the end of June that the assignment to El Paso was approved and that he should move there immediately; Mahy denied this. On appeal, both Melendez and the government misstate the evidence by claiming that Mahy told him this at the end of July when the contract finally expired.

**4.** At trial, Melendez testified that he had worked at least part-time after July 31; however, the testimony here is confusing.

**5.** In his brief, Melendez erroneously claims that he was notified on August 22, 1985, of the Brawley position. For this fact, he cites to the portion of the record in which an NHSC official testified that Melendez was notified on September 22. The latter date is also incorrect, as it is evident from the documentary evidence that Melendez had been notified prior to that time.

breached the private practice agreement by failing to reassign him within a reasonable time such that the breach excused his duty to perform under the contract and (2) the Secretary prevented him from fulfilling his obligation by failing or refusing to provide him with another service option within a reasonable time and by failing to approve the agreement he entered into with the clinic in El Paso.

■ Whatever contractual remedies might be implicated by the government's alleged conduct regarding its obligations under the private practice agreement, contract principles do not apply in this case. The conditions imposed upon an NHSC scholarship recipient arise from statutory directives, not from a negotiated agreement between the parties. *Rendleman v. Bowen,* 860 F.2d 1537, 1541 (9th Cir.1988). "Statutory intent, therefore, is more relevant to the interpretation of these conditions than are common law contract principles." *Id.* at 1541–42. Moreover, "the plain language of the statute demonstrates that Congress did not intend that contract principles govern the interpretation of the relationship between the Secretary and a scholarship recipient." *Id.* at 1542; *see also United States v. Hatcher,* 922 F.2d 1402, 1406–07 (9th Cir.1991). Accordingly, Melendez's contract claims do not identify a fact issue on which the jury was entitled to deliberate.

■ That is not to say that the acts or omissions of the Secretary that affect the ability of the scholarship recipient to fulfill his obligation can never provide a basis for relief. Although the act does not specifically address the consequences of a "breach" by the government, the act does provide for those situations in which performance may be excused:

> The Secretary shall by regulation provide for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program ... whenever compliance by the individual is impossible or would involve extreme hardship to the individual and if enforcement of such obligation

with respect to any individual would be unconscionable.

42 U.S.C. § 254o (d)(2).

Melendez requested a waiver under this section, which the Secretary denied. Melendez did not, however, plead a cause of action under the Administrative Procedure Act, 5 U.S.C. § 702, to challenge that decision. Even if Melendez's reasonable-time and prevention claims are construed as challenges under the analogous concepts embraced in section 254o (d) (a construction to which he may not be entitled in light of his being represented by an attorney, *see Jacquez v. Procunier,* 801 F.2d 789, 792–93 (5th Cir.1986)) the factual issues thus presented are nevertheless so strongly and overwhelmingly controverted that reversal of the district court's directed verdict would not be warranted.

In this regard it is noted that, in the interest of servicing the public policy goals of the statute, the service obligation was intended to be one not easily avoided. The NHSC scholarship program "is not intended 'as a mechanism solely to subsidize health professional education,' but 'as a means to overcome a geographic maldistribution of health professionals.'" *Rendleman,* 860 F.2d at 1541 (quoting S.Rep. No. 94–887, 94th Cong., 1st Sess. 201 (1975)); *Buongiorno v. Sullivan,* 912 F.2d 504, 509–10 (D.C.Cir.1990). That Congress intended the obligation of an NHSC participant be fulfilled except in extreme circumstances is indicated by the punitive nature of the liquidated damage provision set out in § 254o (b). *See United States v. Duffy,* 879 F.2d 192, 198 (6th Cir.1989).

In the regulations promulgated under this statute, the Secretary considers compliance impossible only if the participant suffers from a physical or mental disability resulting in the permanent inability of the participant to perform the services. 42 C.F.R. § 62.12(c). No reasonable juror could conclude that the one-and-one-half-month delay in reassigning Melendez to another HMSA or the failure to obtain approval for the El Paso job rendered impossible his ability to fulfill his service commitment in California.

Similarly, Melendez presents no evidence indicating that he could not accept the Cali-

fornia position without incurring extreme hardship. In determining whether a service obligation poses an undue hardship and is "against equity and good conscience," the Secretary will consider "(1) The participant's present financial resources and obligations; (2) The participant's estimated future financial resources and obligations; and (3) The extent to which the participant has problems of a personal nature, such as physical or mental disability, terminal illness in the immediate family which so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred." 42 C.F.R. § 62.12(d). Melendez has not presented evidence in his favor on any of these factors. Thus, no reasonable juror could find that a hardship waiver was warranted by the Secretary's actions.

There was no error in the granting of a motion for directed verdict. The judgment is AFFIRMED.