**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lance Bart BECKER, M.D.,**
**Defendant-Appellant.**

**No. 92–2679.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1993.

Decided June 14, 1993.

---

Jonathan Haile (argued), Richard G. Ferguson, Office of the U.S. Atty., Crim. Div., Chicago, IL, for plaintiff-appellee.

Michael Dockterman (argued), Kelly L. Murray, Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendant-appellant.

Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

When David puts down his sling and makes a contract with Goliath, David should not be surprised when it turns out that Goliath has superior power under their agreement. So it is with this appeal. As a medical student, Lance Becker made a contract with the United States government. The government paid for two years of his medical schooling; in return Becker promised that after he became a doctor, he would practice medicine in an understaffed area for two

years wherever the government chose or return his scholarship. When the government changed its priorities and would not assign him to a position in his chosen specialty, Becker neither served nor repaid the money. Now the government is suing Becker to collect its debt plus interest and penalties. Becker claims that he has served more than two years without credit in understaffed areas, and that the government improperly changed the rules that had determined his choice of residency programs. But the government had the power under their agreement to treat Becker as it did, and Becker must pay.

Becker was a medical student at the University of Illinois College of Medicine in Chicago from 1977 to 1981. During the 1977–1978 year, he received a scholarship award of $8,886 under the Public Health and National Health Service Corps Scholarship Training Program ("PH/NHSC").[1] In return for this award, Becker agreed to serve the government for two years as a health care practitioner, and agreed that if he failed to do so he would be liable to repay the award amount plus interest. Becker's application certified that he was willing to serve in any area as exigencies might require.

The following year Becker again requested scholarship funds and was awarded $8,438 under the National Health Service Corps Scholarship Program ("NHSC"), the successor to PH/NHSC.[2] This program allowed Becker to defer his service obligation for three years to complete his residency training. In return for the award, he agreed to serve for two years in a "health manpower shortage area" as a federal employee or in private practice—but in either case the government could assign him where it wished. He also agreed that if he failed to complete his service he would be liable for three times the amount awarded. See 42 U.S.C. §§ 254l(f), 254m–o. Becker declined federal support for his final two years of medical school and graduated in June 1981. The PH/NHSC and NHSC statutes provided that awardees must serve one year for each year they received a scholarship, but that each awardee must serve a minimum of two years. Thus although Becker accepted awards in both 1977 and 1978, his total service obligation was two years.

In August 1980 the Department of Health and Human Services ("HHS") notified Becker that he could request a deferment of his service obligation in order to pursue advanced clinical training. Becker replied by requesting deferment for a combined four-year residency in internal and emergency medicine. HHS never acted on this request, and explained in a December 1980 letter to Becker that it had developed a new form that he must complete before his deferment would be granted. Becker received the new form in March 1981 and requested deferment for a three-year residency in internal medicine. He had hoped to pursue a joint emergency and internal medicine residency, but he was not admitted to that course of study and he chose to pursue an internal medicine residency because it allowed him to become board certified in both areas by practicing in an emergency room for five years. HHS granted Becker deferment for all three years of his internal medicine residency at Michael Reese Hospital and Medical Center in Chicago.

In May 1983, Becker learned that HHS had a new policy for assigning scholarship recipients like himself to emergency rooms to complete their service obligation. In response to a glut of emergency room physicians, HHS had decided that it would assign NHSC awardees to emergency room practice only if the awardee had pursued an emergency medicine residency. This was bad news for Becker. Although his residency was in internal medicine, he had planned to become certified in emergency medicine by practicing in that area as he performed his service under the NHSC program, and HHS's old policy would have permitted him to do so.

---

1. This program was enacted as part of the Emergency Health Personnel Act Amendments of 1972, Pub.L. No. 92–585, 86 Stat. 1504–1506, then codified at 42 U.S.C. § 234.

2. This program was created by the Health Professions Educational Assistance Act of 1976, Pub.L. No. 94–484, 90 Stat. 2243, 2281–2289, codified at 42 U.S.C. §§ 254l–o, originally codified at 42 U.S.C. §§ 294t–y.

The new policy threw Becker's career plans awry. Unless he could figure out a way to fulfill his debt to the NHSC in an emergency room, he would be forced to choose between defaulting on the NHSC and abandoning his goal to become certified in emergency medicine.

Over the next few months, Becker made several efforts to get an emergency room placement that would satisfy his obligations to HHS, but all of these failed. Becker sought the assistance of a staff member at the Illinois Department of Public Health to find an emergency room placement that would meet HHS's criteria, and learned that Michael Reese Hospital had a pressing need for emergency room physicians at that time. He applied to HHS for this placement in September 1983, but was rejected in May 1984 and again in August 1984 because that institution was no longer on an approved list of "Health Manpower Shortage Areas." In May 1984 HHS notified Becker that to fulfill his service obligation he would be placed in an internal medicine practice at the South Chicago Medical Center.

Becker responded immediately with a letter to HHS stating that his assignment to internal medicine practice at South Chicago was "totally unacceptable," and on July 5, 1984, HHS placed Becker in default because it concluded that he did not intend to begin fulfilling his service obligation. As to his first scholarship under the 1972 statute, he became liable to pay the government the amount of that award plus interest. As to his second scholarship under the 1976 statute, he became liable for three times the amount plus interest as set forth by the formula at 42 U.S.C. § 254o (b).

Becker's run-ins with HHS were not over. In December 1987 Congress enacted a Special Repayment Program ("SRP") for defaulting scholarship recipients like Becker. Pub.L. No. 100–177, § 204, 101 Stat. 986, 1000–1003; 42 U.S.C. § 254o (note). This program allowed them to discharge their liability by serving at a site on two 1988 Health Manpower Shortage Area Placement Opportunity Lists ("HPOLs"). As required by the statute, in February 1988 HHS notified Becker that he could satisfy his debt through service under the SRP. HHS sent him a contract stating that he could be assigned under the terms of the statute by August 1988. This contract only outlined the SRP's general terms; it did not purport to assign Becker to a particular location. On May 25 of that year, Becker returned this contract but altered it to state that he would serve in internal medicine at the Mandel Clinic Acute Care Center affiliated with Michael Reese Hospital beginning July 1988. HHS rejected the altered agreement and offered Becker a second chance to sign the form contract. When Becker refused, HHS told Becker that he was no longer eligible to participate in the SRP.

The government filed suit against Becker in March 1990 for repayment of his scholarships plus interest and penalties. In a May 5, 1992, memorandum opinion, the district court granted the United States' motion for summary judgment, rejecting Becker's contention that the NHSC breached its contract by denying Becker the chance to fulfill his obligation in an emergency room. Concluding that there were no disputed material facts, the court found that Becker had breached his obligation to serve as assigned and entered a $110,974 judgment for the United States. On appeal, Becker offers several affirmative defenses to liability, urging that HHS acted beyond the scope of its authority under various statutes and that HHS breached its 1977 contract with Becker. Unfortunately for Becker, he reads the statutes too narrowly and his contractual rights too broadly.

■ First, Becker contends that his 1977 scholarship award was a contract and that NHSC breached this contract by applying to Becker its 1983 policy restricting emergency room placements to those who specialized in emergency medicine. He relies on wording stating "The awardee agrees to accept the obligation to comply with Section 225 of the PHS act and the regulations * * * [and] policies in effect at the time of this award." Defendant's brief at 16; defendant's appendix at A.11. Becker asserts that the "policies in effect at the time of [his 1977] award" allowed him to serve in an emergency room whether or not he completed an emergency

medicine residency. He reasons that by including the quoted language in his award, PH/NHSC or NHSC was contractually bound to apply 1977 regulations to him for the remainder of their relationship.

This argument has several flaws. As the government observes, the language Becker relies on binds Becker ("the awardee") and not the government. Equally fatal to Becker's contract point, his 1978 award superseded the terms of his 1977 award. The former was under the PH/NHSC program, while the latter was under the successor NHSC program. The 1978 regulations provided that terms and conditions of the NHSC scholarship program applied to a participant's entire obligation incurred under both that program and the earlier PH/NHSC program. 42 CFR 62.14 (1978 ed.). When he accepted his 1978 award, Becker agreed to serve in the "health professional shortage area * * * to which he is assigned by the Secretary * * *." 42 U.S.C. § 254*l* (f)(B)(IV). He could not assume he would be able to serve where he wanted or in a specialty outside his primary expertise. *Rendleman v. Bowen,* 860 F.2d 1537, 1541–1544 (9th Cir.1988). For this reason, Becker cannot argue that the United States breached the conditions of the 1977 award by changing its rules about who would qualify for emergency room placement.

Furthermore, *Rendleman* noted that the relationship between an awardee and NHSC does not arise from a negotiated agreement but is provided for by statute, and thus statutory intent is more relevant to interpret its conditions than common-law contract principles.[3] *Id.;* see *American Hospital Association v. Schweiker,* 721 F.2d 170, 183 (7th Cir.1983), certiorari denied, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553. Congress established the NHSC Scholarship Program to provide health care to under-served areas of the country. Becker offers no evidence (and we found none) that Congress intended to deny PH/NHSC or NHSC the flexibility to alter its regulations to meet changing circumstances that might exist in under-served areas. The statutes did not give Becker any right to unvarying conditions of service over the course of his relationship with PH/NHSC or NHSC. Becker was required to serve as assigned, and NHSC was not obligated to afford him any particular deferment opportunities. *United States v. Citrin,* 972 F.2d 1044, 1049 (9th Cir.1992).

Becker's contract argument also relies on an August 24, 1984, letter in which HHS referred to its approval of Becker's plan to obtain dual board eligibility in emergency medicine and internal medicine. On July 10, 1986, HHS told Becker that its August 24 statement was made in error. Becker of course knew he was not deferred in emergency medicine because he himself had thrice requested deferment only for internal medicine. R. Tabs D11–12. HHS's August 24 letter creates no disputed issues of fact, and it is irrelevant because Becker was never admitted to, nor did he defer for, the emergency medicine program.

▪ Second, Becker asserts that NHSC's 1983 rules on emergency room placement violated the Administrative Procedure Act ("APA") because they were enacted without following the APA's requirements on administrative rule making. 5 U.S.C. § 553. NHSC developed the 1983 emergency medicine policy because of a sudden increase in emergency medicine specialists available for placement on the 1984 HPOL. NHSC endeavored to put enough sites on the 1984 HPOL to permit those who had completed an emergency medicine residency to work in emergency rooms, while primary-care practitioners like Becker were to be used elsewhere. We find that because the HPOL involves factual determinations that must change in response to the fluid demands of the health care market, its preparation is not "rule making" that invokes the APA's requirements. *United States v. Cooper,* 699 F.Supp. 69, 74 (W.D.Pa.1988). The 1983 policy on emergency medicine placement directly related to preparing the 1984 HPOL, and thus the APA's requirements did not apply to that policy.

---

**3.** This does not mean that the government and Becker did not have a contract, of course; the statute describes the scholarship agreement as a "contract" at 42 U.S.C. § 254*l* (f).

In tandem with his APA argument, Becker proposes that the 1983 rule change denied him due process. The due process point is argued so briefly, with just one supporting citation, that we need not consider it. In any event the claim fails because Becker could not show that the statutes gave him reasonable grounds to believe he was entitled to serve in an emergency room; where the government does not abridge a legitimate claim of entitlement, there is no due process violation. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548.

■ Finally, Becker argues that HHS improperly denied him a chance to repay his service obligation under the Special Repayment Program enacted in 1987. As noted above, the SRP permitted NHSC scholarship recipients who were in default to fulfill their service obligation by serving at a site on one of two HPOLs. HHS and Becker agree that he received timely notice of his opportunity to serve, and that he returned a contract to HHS. But HHS insists the altered contract that Becker returned did not provide "notice" that he intended to participate in the SRP because he only offered to serve at one clinic rather than at the Secretary's discretion. HHS argues that Becker refused a second chance to sign its form contract, and therefore HHS was entitled to exclude him from the SRP. Becker disagrees.

If Becker wished to participate in the SRP, Section 204(a)(3) of that statute required him to "notify the Secretary that [he] intend[ed] to enter into a written contract * * * to provide service in accordance with [subsections] (b) or (c)." Pub.L. No. 100–177, 101 Stat. 1000; 42 U.S.C. § 254o (note). The contract Becker received from HHS did nothing more than paraphrase subsections (b) and (c), which explained that defaulting scholarship recipients would be assigned to serve at a site on one of two HPOLs. It did not assign Becker to a particular location. Becker's alterations to HHS's contract stated that he agreed to serve only at the Mandel Health Clinic of Michael Reese Hospital, and even that he planned to accept a position there. He did not offer to accept placement in any emergency room or other setting on the two HPOLs, and thus HHS was entitled to interpret his emendations as a refusal to serve under (b) and (c).

Becker also argues that HHS was required to issue regulations designating sites on the two HPOLs before it forced him to decide whether he would participate in the SRP. The statute implies the opposite in Section 204(a)(5): "Any individual who enters into a contract under this subsection shall be afforded an opportunity to locate and negotiate a placement in accordance with this section * * *." This provision appears to contemplate that individuals will contract with the Secretary to participate in the SRP before they negotiate over their placement. Section 205 requires the Secretary to issue "regulations for the loan repayment programs established by the[se] amendments" within 180 days of the statute's enactment, but we do not read this very general language to demand that HHS had to formulate a final HPOL for defaulters to consider before agreeing to participate in the SRP. Such a reading would give defaulters better information than they had when they initially accepted awards as medical students—when they had no idea what the HPOL would look like in four years.[4] We need not read an already generous amnesty statute to hobble the Secretary by requiring her to give defaulters perfect information before they decide (again!) whether or not they will honor their obligations.

Becker has consistently attempted to deal with the government on his terms, not the government's. He may be correct to assert that he has served in understaffed areas that should have satisfied his statutory obligations. Congress, however, gave HHS the power to decide what sites would appear on the HPOL and assign Becker to a site of its own choosing. Congress allowed Becker to request a location where he would fulfill his obligation and nothing more. In the present case HHS even accommodated Becker with a placement in his home city at the South

---

**4.** The only other provision of the 1987 statute requiring the Secretary to issue regulations was Section 204(a)(6), governing reduction of liability to reflect credit for partial service of a scholarship obligation. That requirement is not involved here.

Chicago Medical Center. Others have not been so lucky.[5] We find that Becker is in default because he accepted government money under a statute that required him to serve as assigned and then he refused to do so. As there are no material facts in dispute, summary judgment for the United States is affirmed.

---

5. *Rendleman,* 860 F.2d at 1541 (awardee requesting placement in Portland, Oregon assigned to Evergreen, Alabama); *United States v. Melendez,* 944 F.2d 216, 218 (5th Cir.1991) (awardee transferred to California after losing his first position in Texas).