**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Barbara VANHORN, Defendant–
Appellant.**

**No. 93–1133.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1993.

Decided March 23, 1994.

**ARGUED:** Jay Loring Cohen, JAY L. COHEN, P.C., Bethesda, Maryland, for Appellant. Jeanette Plante, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Gary P. Jordan, United States Attorney, Baltimore, Maryland, for appellee.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and WIDENER and WILLIAMS, Circuit Judges.

## OPINION

WILLIAMS, Circuit Judge:

On appeal in this civil suit, Dr. Barbara Vanhorn challenges the lower court's determination that she did not fulfill the terms of her National Health Services Corps Scholarship agreement with the Government. After Dr. Vanhorn's testimony, the district court issued judgment as a matter of law for the United States pursuant to Fed.R.Civ.Proc. 50(a) and awarded compensatory damages, interest, and a treble-damage penalty. Concluding that the district court correctly held that contract defenses are not available to relieve Dr. Vanhorn of her statutory liability and correctly applied the Rule 50(a) standard in finding that a reasonable jury could not

have decided in favor of Dr. Vanhorn, we affirm.

### I.

Between 1977 and 1980, Dr. Vanhorn applied for and received three one-year scholarship awards totaling $26,582.00 from the National Health Service Corps (NHSC) scholarship program.[1] The NHSC program was created in 1976 to address the problem of a decline in the number of doctors available to serve rural areas by providing "a generous scholarship program for students who will undertake service in an area or program into which the Secretary [of Health and Human Services] finds it difficult to attract health professionals...."[2] Through the program, scholarship funds to cover tuition and educational expenses are provided in return for the recipient's agreement to serve for a period of time equivalent to the greater of the number of years of support received or two years. 42 U.S.C.A. § 254l (f)(1)(B)(iv) (West 1991). All scholars in the program must sign written contracts agreeing to serve in an assigned Health Professional Shortage Area (HPSA)[3] as either a commissioned officer of the Public Health Service or in civilian service.[4] The terms of the agreement between the scholar and the Government are specified by statute. 42 U.S.C.A. § 254l (f) (West 1991).

The NHSC Act additionally provides that if the individual funded under the program breaches her contract "by failing (for any reason ...) either to begin such individual's service obligation ... or to complete such service obligation," the United States is entitled to recover three times the amount of scholarship funds awarded, plus interest. 42 U.S.C. § 254o (b)(1)(A) (1988). The defaulting scholarship recipient must pay this sum within one year of default. *Id.*

In return for the scholarship money she received to fund her medical education at Howard University College of Medicine, Dr. Vanhorn agreed to serve for three years in the HPSA to which she was assigned by the Secretary of Health and Human Services. Upon Dr. Vanhorn's graduation in 1980, she requested and was granted a three-year deferment from her NHSC obligation in order to complete a residency in family practice.[5]

In 1982, before completing this residency, Dr. Vanhorn applied to serve her obligation after the residency through the Private Practice Option (PPO).[6] Dr. Vanhorn obtained

---

1. *See* 42 U.S.C.A. §§ 254l to 254q (West 1991). For the first year of her scholarship, 1977–1978, Dr. Vanhorn received funds under the Public Health and National Health Service Corps Scholarship Training Program (PH/NHSC). For the next two school years, Dr. Vanhorn received funds under the National Health Service Corps Scholarship Program (NHSC), which was the successor program to PH/NHSC. The terms and conditions of the later awards superseded the terms of the 1977–1978 award; the 1978 regulations provide that terms and conditions of the NHSC scholarship program apply to a participant's entire obligation incurred under both that program and the earlier PH/NHSC program. *United States v. Becker*, 995 F.2d 779, 783 (7th Cir.1993) (citing 42 CFR 62.14 (1978 ed.)). Because the obligations under the PH/NHSC program and the NHSC program do not differ in any way pertinent to this appeal, we address the issues, as did the parties, in terms of the NHSC program.

2. S.Rep. No. 92–1062, 92nd Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4832, 4841.

3. 42 U.S.C.A. § 254e(a)(1) (West 1991). HPSAs were previously referred to as Health Manpower Shortage Areas, or HMSAs. Congress has given the Secretary of Health and Human Services the authority both to designate HPSAs and to assign scholarship recipients to those areas. 42 U.S.C.A. §§ 254e, 254m (West 1991).

4. A scholarship recipient may, as Dr. Vanhorn did, apply to serve in private practice. 42 U.S.C.A. § 254n (West 1991). The recipient may alternatively serve as a civilian employee of the Government, 42 U.S.C. § 254m(b)(1)(B) (1988), or as a commissioned officer in the Public Health Service. *See* 42 U.S.C. § 254m(b)(1)(A) (1988). Recipients of National Research Service Awards may also at least partially satisfy their obligation through that program. 42 U.S.C. § 254m(e) (1988); *see United States v. Bills*, 822 F.2d 373, 379 (3d Cir.1987).

5. By statute, the Secretary may grant deferments for advanced clinical training in approved fields of specialty. 42 U.S.C. § 254m(b)(5)(A)(i) (1988); 42 CFR § 62.9 (1992); *United States v. Citrin*, 972 F.2d 1044, 1047 (9th Cir.1992).

6. The Private Practice Option requires that the scholar enter a written agreement for a period of service in a full-time private clinical practice in

written approval to pursue. her PPO at the Howard University Family Health Center, which was located in the North Capital HPSA. The contract provided that she was to serve in a full-time private practice at the Howard Center or at "such other location as may be agreed upon by the Secretary." (J.A. at 150.) Dr. Vanhorn completed her residency on schedule and reported to work at the Howard University Center in July 1983. Unfortunately, the Center was unable to pay her salary due to an unanticipated shortage of funds.

After working for six weeks without pay, Dr. Vanhorn left the Center in August 1983. Dr. Vanhorn sought guidance from her Project Officer, James Russo, who was responsible for all direct contact between Dr. Vanhorn and the Public Health Service.[7] Dr. Vanhorn testified that Russo "told me I could set up almost anywhere in Anacostia and be

in compliance." (J.A. at 98.) Russo did not dispute that he told Dr. Vanhorn this, but testified that he also told her that any move would require formal written approval from the Secretary.

Thereafter, in September 1983, Dr. Vanhorn started a private practice at Good Hope Road in Anacostia in the District of Columbia. The Good Hope Road location was near the Anacostia HPSA, which bordered some of the same census tracts contained in the North Capital HPSA to which Dr. Vanhorn had been assigned.[8] Dr. Vanhorn neither applied for, nor ever received, the required written approval for the move.[9] She claims that Russo's representations led her to believe the move would definitely be approved. Dr. Vanhorn also says she did not submit the required forms because Russo never forwarded them to her as promised.[10]

the HMSA (now HPSA) selected by the Secretary. 42 U.S.C.A. § 254n(a) (West 1991). Other statutory provisions limit the amount a PPO scholar may charge patients for services, prohibit discrimination, and allow the Secretary to promulgate other regulations as may be required. 42 U.S.C. § 254n(b) (1988). If the scholar breaches these requirements, the Secretary may permit her to enter the NHSC to satisfy her obligation. 42 U.S.C. § 254n(c) (1988).

7. The Public Health Service, which administers the NHSC program, is part of the Department of Health and Human Services. 42 U.S.C. § 202 (1988). The Project Officer monitors the scholar's progress and answers any questions that the scholar has about the scholarship program during the scholar's schooling and during the period of obligated service afterward.

8. Although neither the Howard University Family Health Center nor Vanhorn's Good Hope Road Clinic were located within a HPSA, a facility did not need to be within a HPSA to be an approved location. All that was required was that the facility serve an identified underserved population living within a HPSA. While the Howard Center was an approved location for NHSC service, Dr. Vanhorn's clinic was not. Dr. Vanhorn provided no evidentiary support for her position that her Good Hope Road Clinic, located near the Anacostia HPSA, served the same underserved population served by the Howard Center, which served the North Capital HPSA. Indeed, the fact that the two facilities were located near different HPSAs negates her argument that the same population was served. Further, Vanhorn never introduced any evidence at trial that her patients came from addresses within any HPSA.

9. Carolyn Beth Lee, who at the time of trial was Acting Director of the NHSC Division of Scholarships and Loan Repayment, testified that formal written approval for a change in PPO location is required to assure that the services are actually going to the people who are in need and that health care is actually being given to the underserved. Without written approval, a scholarship recipient's service does not qualify to satisfy her obligation to the Government. *United States v. St. Thomas*, 966 F.2d 476, 479 (9th Cir.1992).

10. Even assuming that Dr. Vanhorn never received the requisite forms that Russo agreed to provide, that fact would not excuse her default. An NHSC scholarship recipient breaches her scholarship contract when she fails to begin or complete her service obligation. *See* 42 U.S.C. § 254*o* (b)(1)(A) (1988). Under the Act, performance may be excused by the Secretary "whenever compliance by the individual is impossible or would involve extreme hardship ... and if enforcement ... would be unconscionable." 42 U.S.C. § 254*o* (d)(2) (1988). Dr. Vanhorn has not shown or alleged that Russo's failure to mail the proper approval forms rendered her compliance either impossible or an extreme hardship and that enforcement would be unconscionable. Dr. Vanhorn presented no evidence that she made any other attempt to obtain the requisite forms during the more than three years she maintained the Good Hope Clinic, nor did she seek approval for that location from the Secretary before signing a Forbearance Agreement and then a Special Repayment Program Agreement. Both of these later agreements acknowledged Dr. Vanhorn's debt to the Government, and under them she agreed to satisfy her debt through further approved service. Dr. Vanhorn breached not only her scholarship contract, but

After the move she neither submitted any of the status reports or reviews required under her original PPO agreement, nor submitted her practice to periodic inspection as required for maintaining approval of a PPO.[11]

Russo testified from his contemporaneous notes that shortly after he learned of Dr. Vanhorn's practice in Anacostia, he informed her that the move placed her in default of her obligations. Although he had told Dr. Vanhorn she could "set up almost anywhere out there" and comply with her agreement, he also told her that official written approval for her new location was required. (J.A. at 70.) In March 1984, within six months of beginning her practice, Dr. Vanhorn received a letter from the Director of the Division of Health Services notifying her that she was in default on her NHSC obligation.[12] Disregarding the notice of default, Dr. Vanhorn continued practicing medicine at the Good Hope Clinic, working there for a total of three years and nine months.

In March 1985, after the Department of Health and Human Services (DHHS) notified Dr. Vanhorn that she should begin to pay her debt to the Government, Dr. Vanhorn signed a Forbearance Agreement. At her request, DHHS also reviewed her file and determined that she had correctly been placed in default. Under the Forbearance Agreement, Dr. Vanhorn again agreed to serve three years at a high priority location assigned by the Secretary. In return, DHHS agreed that if Dr. Vanhorn completed her obligation, it would suspend collection of her financial debt. Pursuant to the agreement, Dr. Vanhorn was assigned to the Panhandle Rural Health Cor-

poration in Amarillo, Texas. Dr. Vanhorn never reported to the Texas facility and was placed in default of the Forbearance Agreement.

In May 1988, Dr. Vanhorn signed yet another contract with the Government. Under this agreement, a Special Repayment Program Agreement, DHHS agreed once again to forbear collection of Dr. Vanhorn's debt and she again agreed to serve her obligation at a site approved by the Secretary. Nevertheless, Dr. Vanhorn failed to apply for or to receive approval for an appropriate site. Unable to obtain service satisfying her obligation, the United States filed suit against Dr. Vanhorn for compensatory damages, interest, and a treble-damage penalty pursuant to 42 U.S.C. § 254o (b)(1)(A) (1988), which totaled $183,953.12.

## II

■ At the close of Dr. Vanhorn's direct testimony,[13] the district court entered judgment as a matter of law for the United States pursuant to Fed.R.Civ.P. 50(a). The question whether judgment as a matter of law is appropriate is reviewed de novo on appeal. *Gairola v. Virginia Dept. of General Services*, 753 F.2d 1281, 1285 (4th Cir.1985). We must ask "whether, without weighing the evidence or considering the credibility of the witnesses, 'there can be but one conclusion as to the verdict that reasonable jurors could have reached.'" *Id.* at 1285 (quoting *Wheatley v. Gladden*, 660 F.2d 1024, 1027 (4th

these subsequent agreements as well. Her allegation that Russo did not mail the required forms to obtain approval of her unilaterally-chosen Good Hope Road location has no bearing on the outcome of this dispute and such failure would not, in any event, excuse Dr. Vanhorn's failure to satisfy her obligation under each of the contracts she signed and breached. *See United States v. Arron*, 954 F.2d 249, 252 (5th Cir.1992).

11. The PPO Agreement required Dr. Vanhorn to submit periodic status reports which identified the number of patients being seen, where those individuals resided, the number of patients under Medicare or Medicaid or the amount of Medicare/Medicaid assignments which were accepted, and the hours of service that she provided. Pro-

viders in the PPO option must engage in full-time clinical practice. *See* 42 U.S.C.A. § 254n(a) (West 1991). Dr. Vanhorn does not dispute the fact that she never submitted the required reports to the NHSC.

12. The letter also informed Dr. Vanhorn that the amount she owed the Government because of her default would be calculated according to the statutory formula, resulting in a debt of three times the scholarship monies received plus interest.

13. According to Dr. Vanhorn, she had no other evidence to offer other than witnesses to support her credibility if it were attacked on cross-examination.

Cir.1981)). We agree with the district court that this test was met, and that judgment as a matter of law was properly granted.

■ Dr. Vanhorn argues that the district court erred in refusing to apply ordinary contract defenses of substantial compliance, estoppel, and economic duress to excuse her noncompliance with the agreements that she signed with the Government. Because we find that the relationship between Dr. Vanhorn and the Government is governed by statute, and ordinary contract principles do not apply, we reject her contentions.

Dr. Vanhorn signed four agreements: the original scholarship contract, a Private Placement Option Agreement (PPO Agreement), a Forbearance Agreement, and a Special Repayment Program Agreement.[14] Dr. Vanhorn argues that while the scholarship contract is undoubtedly a creature of statute, the PPO Agreement and the Forbearance Agreement are not. She admits that the NHSC Act mandates some of the terms of the PPO Agreement,[15] but argues that apart from those terms, the PPO Agreement should be interpreted like any other contract.[16] She argues that if ordinary contract principles do apply, the contract defenses that she asserts preclude the Government from prevailing in this action.

Dr. Vanhorn's argument is disingenuous. The relationship between the scholarship recipient and the Government is statutory, not contractual, and each contract she signed falls within the statutory rubric.[17] In *Rendleman v. Bowen*, 860 F.2d 1537, 1542 (9th Cir.1988), the Ninth Circuit stated: "the plain language of the statute demonstrates that Congress did not intend that contract principles govern the interpretation of the relationship between the Secretary and a scholarship recipient." *See also United States v. Becker*, 995 F.2d 779, 783 (7th Cir. 1993) (statutory intent is more relevant to interpreting NHSC conditions than common law contract principles); *United States v. Arron*, 954 F.2d 249, 251 (5th Cir.1992) (conditions imposed upon NHSC scholarship recipients arise from statute and not negotiated agreement; thus, statutory intent and not contract principles govern interpretation of those conditions); *United States v. Citrin*, 972 F.2d 1044, 1049 (9th Cir.1992) (the contract defense of repudiation does not apply to NHSC scholarship agreements); *United States v. Melendez*, 944 F.2d 216, 219 (5th Cir.1991) (contractual remedies are irrelevant in NHSC scholarship action; statutory intent governs); *United States v. Hatcher*, 922 F.2d 1402, 1406 (9th Cir.1991) (obligations under the NHSC program are not governed by contract principles); *United States v. Bills*, 822 F.2d 373, 377 (3d Cir. 1987) ("Government contracts differ from agreements between private parties.").

As the Fifth Circuit noted in *Melendez*, 944 F.2d at 219, "[t]he conditions imposed upon an NHSC scholarship recipient arise from statutory directives, not from a negotiated agreement between the parties." The scholarship recipient in *Melendez* began serving his three-year service commitment at an assigned clinic in El Paso, Texas, but that

---

14. Dr. Vanhorn does not address the Special Repayment Program Agreement in her briefs to this court. Our disposition of the case makes consideration of it unnecessary.

15. As Vanhorn points out in her brief to this court, 42 U.S.C. § 254n(b)(1)(A) (1988) regulates the fees charged by the doctor and 42 U.S.C. § 254n(b)(1)(B) (1988) prohibits discrimination by the doctor. Section 254n also contains provisions concerning the payment of the NHSC scholar's travel expenses, the sale of equipment and supplies after service, technical assistance, and breach of the PPO. *See* 42 U.S.C. § 254n(c)–(g) (1988).

16. We note that agency actions and decisions are governed by the Administrative Procedure Act (APA). Dr. Vanhorn does not argue in this case that the APA has been violated, or that the actions regarding her were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law" within the meaning of that Act. *See* 5 U.S.C. § 706(2)(A) (1988).

17. Dr. Vanhorn's Forbearance Agreement is contemplated by 42 U.S.C. § 254n(c) (1988), which provides that in the case of a scholarship recipient who opts for the PPO and then defaults, "the Secretary may permit such individual to perform such service obligation as a member of the Corps."

clinic did not renew his contract of employment for a second year. After a month of unemployment, Melendez was assigned to a site in Brawley, California, but never reported to work. As in this case, Melendez claimed that his project officer orally modified his PPO Agreement by telling him that he did not have to report to California. The Fifth Circuit affirmed a directed verdict for the Government, finding that "contract principles do not apply in this case ... [and so] Melendez's contract claims do not identify a fact issue on which the jury was entitled to deliberate." *Id.* at 219.

The *Melendez* court held that there was no issue for the jury because the Government proved the contract, proved the funding of the student, and proved that the student did not perform the obligation as approved or contracted. Similarly, in this case the Government has proved the contract with Dr. Vanhorn, proved that it funded her education, and proved that Dr. Vanhorn did not perform the obligation as approved or contracted. Therefore, there was no issue on which the jury could deliberate.

Dr. Vanhorn, however, argues that courts which hold that ordinary contract principles do not apply in these cases employ faulty reasoning. Without citing a single direct authority regarding NHSC obligations, Dr. Vanhorn argues that ordinary principles of federal contract law do apply to government contracts, pointing to a line of cases enforcing military enlistment contracts which she says supports her view. *See, e.g., Ferrell v. Secretary of Defense*, 662 F.2d 1179, 1181 (5th Cir.1981) (claims that enlistment contracts are invalid or have been breached are decided according to principles of traditional contract law); *Cinciarelli v. Carter*, 662 F.2d 73, 78–79 (D.C.Cir.1981) (civilian courts are to apply traditional contract principles not only to enlistment contracts, but also to military active duty agreements); *Pence v. Brown*, 627 F.2d 872, 874 (8th Cir.1980) (when Air Force recruiters made innocent misrepresentation, recruit was entitled to rescission under general contract principles). However, the military enlistment cases do not arise under a detailed ·statutory scheme like the one governing NHSC scholarships.

The terms of the contractual relationship between the military enlistee and the Government is not regulated by statute, while the terms of the relationship between the NHSC scholar and the Government have been set forth in detail by Congress.

The statutory scheme at issue here is more analogous to grant-in-aid programs, under which the federal government provides money for specific purposes and places conditions on the recipient. For example, the Hill–Burton Act, formally known as Title VI of the Public Health Service Act, 42 U.S.C. § 291, was passed to address the adequacy and distribution of health service facilities with post-Depression and post-war programs. *American Hosp. Assoc. v. Schweiker*, 721 F.2d 170, 172 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984). Under the Act, the federal government gave money to the states to develop and to improve hospital physical facilities and research. In return, the facilities were required to provide no-cost health service to the poor. This requirement was challenged by health care providers because they claimed the requirements restricted freedom of contract. The *Schweiker* court disagreed, finding that:

> Rather than a voluntary agreement negotiated between two parties, a grant-in-aid program ·like that under the Hill–Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals.... Determination of statutory intent, therefore, is of more relevance to the interpretation of these conditions than is an inquiry into the intent of the two parties at the moment of the initial agreement.

*Id.* at 182–83. Similarly, the NHSC scholarship program is an exercise by the federal government of its authority under the constitutionally-granted spending power to bring about a public policy goal, namely, the provision of medical services to underserved ar-

eas. Like the Hill–Burton Act, agreements under this scheme are subject to statutory, not contractual, interpretation.

■ While Dr. Vanhorn did sign separate agreements, they were all governed by statute and did not create a contractual relationship separate from that statute. We agree with the circuit courts of appeal and the numerous district courts which have held that the relationship between the NHSC scholar and the Government is statutory and not contractual, and that ordinary contract principles do not apply to the agreements governing that relationship. *See Melendez,* 944 F.2d at 219; *Rendleman,* 860 F.2d at 1541–42; *United States v. Ledwith,* 805 F.Supp. 371, 374 (E.D.Va.1992), *aff'd,* 998 F.2d 1011 (4th Cir.1993) (unpublished); *United States v. Hugelmeyer,* 774 F.Supp. 559, 561–62 (D.Ariz.1991); *United States v. Turner,* 660 F.Supp. 1323, 1328 (E.D.N.Y. 1987).

■ The damages provision of the statute states that if the scholarship recipient breaches the agreement "for any reason," the recipient may be declared in breach;[18] affirmative defenses are therefore irrelevant. *See United States v. Gross,* 725 F.Supp. 892, 894 (W.D.La.1989) ("The default provision ... is indifferent as to the reason why an individual fails to begin performing his ser-

vice obligation."). These contracts, governed as they are by a comprehensive statutory scheme that provides not only for the scholarship contract but also for private placement option and forbearance agreements, are simply not subject to the defenses that Dr. Vanhorn attempts to assert. We note, however, that the inapplicability of contract principles does not leave the scholar without recourse; appeal may be made to the Secretary of DHHS as the agency overseeing the program, who in proper circumstances may cancel, waive, or suspend the scholar's obligation. 42 U.S.C. § 254o (c)(3) (1988); 42 CFR § 62.12 (1992). Agency action is then reviewable by a court of law and may be overturned when that action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A) (1988).

■ Dr. Vanhorn did not seek waiver or cancellation of her debt from the Secretary, and therefore we have no agency action to review. Because the contract defenses of substantial compliance, economic duress, and estoppel are not valid defenses in cases under this statutory scheme, and because it is undisputed that Dr. Vanhorn failed to satisfy the written terms of her agreements with the Government, the district court did not err in entering judgment for the United States.[19]

---

18. 42 U.S.C. § 254o(b)(1)(A) (1988).

19. Dr. Vanhorn claims that she substantially complied with the requirements of a modified PPO, that the Government is estopped from enforcing the original written agreement because it had been modified orally by a Government agent, and that the defense of economic duress applies to excuse her from compliance with the Forbearance Agreement. We agree with the Government that Dr. Vanhorn has failed to support any of these claims, and that even if contractual principles were applicable, her suit would fail.

Vanhorn does not dispute that she did not complete service at the Howard University Health Center as required under her original PPO Agreement. Rather, she contends that the Government modified her PPO contract through the oral representations of James Russo, her program manager, and that she substantially complied with her contract with the Government by serving in her practice on Good Hope Road. Essentially, Vanhorn's argument is that when Russo told her that she could "set up almost anywhere out there," he modified her agreement

with the Government and the Government cannot now claim that she owes money.

Oral representations by Government officers cannot result in a modification of a statutory contract; such modifications, to be valid, must be in writing. *See United States v. Gross,* 725 F.Supp. 892, 895 (W.D.La.1989) (even if a Government employee makes incorrect representations about a HPSA location, that would not constitute affirmative misconduct that would give rise to estoppel); *United States v. Martin,* 710 F.Supp. 271, 275 (C.D.Cal.1989) (rejecting physician's argument that he was promised that he would be placed in an urban community, and therefore should be excused from refusing to accept a rural assignment). As the Supreme Court held in *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."

The Government is simply not bound by the negligent, unauthorized acts of its agents. Fed-

### III.

Dr. Vanhorn's damages were calculated by the district court pursuant to statute. Under the statutory formula, the amount of scholarship monies given and interest on that amount is trebled. 42 U.S.C. § 254o(b)(1)(A) (1988). *See, e.g., United States v. Hugelmeyer,* 774 F.Supp. 559, 560 (D.Ariz.1991). This trebling of debt plus interest was a change in the law which took place during the time that Dr. Vanhorn was receiving scholarship funds. Before 1978, the defaulting scholarship recipient owed only the amount awarded plus interest. Dr. Vanhorn received $8,828 for the period beginning July 1, 1977 and ending June 30, 1978. Thus, under the applicable section of the former Act, (42 U.S.C. § 234 (Supp. II 1972)), she owed only that amount plus interest from the date of payment; there was no trebling. Dr. Vanhorn received $17,754 for the next two years of her medical study. This amount was subject to the new treble damage rule, and thus interest was added to the scholarship monies and the amount was trebled pursuant to 42 U.S.C. § 254o(b)(1)(A) (1988).

Applying this formula, the district court awarded the Government $183,953.12. Dr. Vanhorn does not challenge the district court's calculation of damages pursuant to the statutory formula. Instead she argues that the disparity between the amount she received in scholarship monies, $26,582, and the amount of damages awarded to the Government, $183,953.12, is unconscionable. We disagree. As the court held in *United States v. Swanson,* 618 F.Supp. 1231, 1243–44 (E.D.Mich.1985):

> To estimate the damages which would be suffered by the loss of the services of a trained ... physician for a three year period in a medically underserved area is difficult, if not impossible, to accurately determine.... [Treble] damages which the government [is] entitled to receive for Defendant's breach of the contract ... [is a] fair and reasonable attempt to fix just compensation in the event of breach.

Furthermore, Dr. Vanhorn was reminded of the escalating penalties, and she was given several opportunities to satisfy her obligation through service. We reject her challenge to the damages awarded by the district court.

### IV.

Dr. Vanhorn also claims on appeal that the district court erred in not giving her partial credit for service rendered. We note that the circuits have split on whether NHSC scholarship recipients who do not fulfill their

eral law is clear that estoppel is rarely, if ever, a valid defense against the Government absent proof of some affirmative misconduct by a Government agent, and estoppel against the Government cannot be premised on oral representations. *Heckler v. Community Health Services,* 467 U.S. 51, 60–63, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984); *United States v. Hatcher,* 922 F.2d 1402, 1409 (9th Cir.1991); *United States v. Ledwith,* 805 F.Supp. 371, 374 (E.D.Va.1992), *aff'd,* 998 F.2d 1011 (4th Cir.1993) (unpublished).

As for Vanhorn's claim that she substantially complied with the NHSC contract, the evidence shows that not only did she not serve in an approved HMSA, she also failed to submit the reports and audits required by the program. There was also evidence that she was not working in a full-time practice as required by the regulations. Under these circumstances, even if substantial compliance were a valid defense, it cannot be said that Vanhorn substantially complied with her agreements.

Finally, Vanhorn challenges the Forbearance Agreement, which she admits that she breached. She obligated herself to serve at the Panhandle Rural Health Corporation and did not report to work. She claims, however, that she executed the agreement under economic duress. In order to void an agreement on the ground of economic duress, it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree. Some wrongful conduct on the part of the Government must be shown; the mere stress of one's financial condition will not amount to duress unless the Government was somehow responsible for that condition. *United States v. Turner,* 660 F.Supp. at 1330. Vanhorn was not threatened with default, as she claims, for she was already in default of her scholarship agreement when the Forbearance Agreement was signed. The Forbearance Agreement simply provided her the opportunity to satisfy her financial obligation through service.

contractual obligations may nonetheless receive credit for service that they have rendered. *Compare United States v. Barry,* 904 F.2d 29, 31 (11th Cir.1990) (no requirement of credit for partial service) *with Rendleman v. Bowen,* 860 F.2d 1537, 1544 (9th Cir.1988) (rejecting the argument that a physician could serve a HPSA other than the one assigned to him and fulfill his NHSC obligation, but instructing the lower court to determine whether self-chosen service might form the basis for a reduction or waiver of damages). *See also United States v. Arron,* 954 F.2d 249, 252 (5th Cir.1992) (whether service at an unapproved site may justify a waiver of damages is a determination solely within the province of the NHSC); *United States v. Gary,* 963 F.2d 180, 185 (8th Cir. 1992) (under the NHSC program, there is no statutory entitlement to partial credit for partial service where a suit is brought for damages upon default).

We need not decide whether partial credit should be awarded in this case, because Dr. Vanhorn did not raise this issue before the agency or the court below, and has not pointed to any exceptional circumstances justifying our consideration of it now. *United States v. Pinckney,* 938 F.2d 519, 522 (4th Cir.1991).

### V.

■ While Dr. Vanhorn may indeed have served an underserved population, in light of the needs and dictates of the NHSC program, we cannot give her relief from her debt to the United States. The NHSC program was established so that DHHS could channel promising young medical students to areas of the country greatly in need of their services. The Secretary must be able to retain control over where the scholarship recipients serve or the program is meaningless. The recipients cannot unilaterally, without proper approval, decide where they wish to serve if the program is to be effective.

In this case, Dr. Vanhorn did not receive the proper approval for her actions. She breached every agreement that she signed with the Government. She did not abide by the original scholarship contract requirement that she submit regular reports on her activities. She signed several subsequent agreements admitting her liability to the Government. The default provision of the NHSC statute straightforwardly states that "if an individual breaches his written contract by failing (for any reason . . .) either to begin . . . or to complete such service obligation, the United States shall be entitled to recover from the individual. . . .". 42 U.S.C. § 254*o*(b)(1)(A) (1988). Regardless of her reasons, Dr. Vanhorn breached her written agreements with the Government and no reasonable jury could have found otherwise. Therefore, we agree with the district court that Dr. Vanhorn is liable for the statutorily mandated compensatory damages, interest, and a treble-damage penalty.

*AFFIRMED.*